IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

        v.                                                       15-CR-227-A

RICHARD PETIX,

        Defendant.

_____

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT TWO OF THE SUPERSEDING INDICTMENT

THE UNITED STATES OF AMERICA, by and through its attorneys, William J. Hochul, Jr., United States Attorney for the Western District of New York, Wei Xiang, Assistant United States Attorney, of counsel, hereby files its opposition to defendant RICHARD PETIX's pretrial motion (Dkt. 23) to dismiss Count Two of the Superseding Indictment (Dkt. 16).

Count Two charges the defendant with operating a money transmitting business in violation of Title 18, United States Code, Section 1960 as follows:

> Beginning in or before August 2014, the exact date being unknown to the Grand Jury, and continuing until on or about December 3, 2015, in the Western District of New York, and elsewhere, the defendant, RICHARD PETIX, did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, as that term is defined in Title 18, United States Code, Section 1960(b)(1)(B), which failed to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder, and which affected interstate and foreign commerce in any manner and degree.

The defendant claims that Count Two merits dismissal under Rule 12(b)(3)(A)(v) of the Federal Rules of Criminal Procedure for an error in the grand jury proceeding and under Rule 12(b)(3)(B)(v) for failure to state an offense.  See Dkt. 23.  To the contrary, Count Two properly charges the defendant's Bitcoin exchange service as an unlawfully operated money transmitting business, and the defendant's motion fails to even allege any actual, prejudicial error in the grand jury proceedings.  Therefore, his motion should be summarily denied.

## PRELIMINARY STATEMENT

As the saying goes, "To catch a small-time drug dealer, follow the drugs; to catch a big drug dealer, follow the money."  Title 18, United States Code, Section 1960 was enacted as part of an anti-money laundering effort, "designed to prevent the movement of funds in connection with drug dealing."  United States v. Faiella, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014) (quoting United States v. Bah, 574 F.3d 106, 112 (2d Cir. 2009)).  It works in conjunction with statutes and regulations designed to help identify, trace, and track the flow of illicit wealth, both derived from and intended to promote, among other unlawful activity, drug trafficking.

In today's age, that drug trade has taken to the Internet.  In the same way that the Internet revolutionized consumer commerce (for lawful purposes), it has also paved the way for customers to access a world's array of contraband with the click of a button.  Vendors on a succession of dark net markets such as Silk Road, Agora, and AlphaBay Market offer a broad selection of goods and services.  For example, a March 2016 perusal of AlphaBay

Market revealed 15,737 listings under the category "Fraud" and 74,105 listings under "Drugs & Chemicals."

Commerce on these markets is widely conducted through payment in virtual currencies. The decentralized, distributed ledger system that is Bitcoin has been particularly popular. Prized for its perceived anonymity and transaction security, Bitcoin is a preferred and sometimes sole method of payment accepted on leading dark net markets. Vendors and customers alike turn to Bitcoin exchangers to transfer fiat money from the physical world to the virtual world as bitcoins, and vice versa. In selling bitcoins to the customers, who pay the bitcoins to the vendors, who then "cash out" the bitcoins, these exchangers or series of exchangers effectively "recirculate" the virtual currency that makes this commerce flow. Count Two of the Superseding Indictment charges the defendant for his conduct as a Bitcoin exchanger in this shadow financial system.

**PROCEDURAL HISTORY**

On December 4, 2015, the defendant was arrested and charged by criminal complaint for violating Title 18, United States Code, Section 1001(a)(2) (making material false statements) during his encounter on December 3, 2015, with agents of Homeland Security Investigations ("HSI") and officers of the United States Probation Office for this District. See Dkt. 1. On December 9, 2015, he was indicted for this charge in a one-count indictment. See Dkt. 3. On March 9, 2015, a superseding indictment added Count Two, recited above. See Dkt. 16.

On July 29, 2016, the defendant filed the instant motion to dismiss Count Two. See Dkt. 23. The one-paragraph motion is accompanied by a 13-paragraph supporting affidavit of defense counsel. See generally id. After a boilerplate introduction and reproduction of some statutory text from 18 U.S.C. § 1960 and 31 U.S.C. § 5330, the affidavit offers a one-sentence summary allegation, unsupported by any facts, of what the defendant thinks the government presented to the grand jury about his conduct, see Dkt. 23-1 ¶ 8, leading to two one-sentence interpretations of said summary, see id. at ¶¶ 9-10, and culminating in a one-sentence conclusion that the government must have obtained the indictment by "improperly characteriz[ing] the Defendant's conduct or the applicable law." Id. at ¶ 11. On this dearth of facts, law, and logic, the defendant seeks dismissal of Count Two. See id. at ¶ 12.

## FACTUAL BACKGROUND[1]

**A.  Background of Bitcoin**

Bitcoin is a "virtual" currency, that is, a medium of exchange that operates like a currency in some primarily Internet-based environments, but does not have all the attributes of real currency, such as legal tender status. Bitcoin is a "convertible" virtual currency in that it has an equivalent value in real currency and acts as a substitute for real currency. This equivalent value is not determined by any authority or entity; rather, it floats on the open market, with its price subject to variations in global supply and demand. During the period charged in Count Two, the equivalent value of a bitcoin in United States dollars fluctuated between approximately $200 and $600.

---

[1]  The following recitation is a limited proffer of certain facts and circumstances. This is not a full proffer of the government's anticipated proof at trial or all known evidence. It is offered to provide perspective on how limited a picture the defendant, despite being the moving party, has painted for the Court.

Lacking physical manifestation, bitcoins exist solely as digitized entries on the "blockchain" ledger, which records every Bitcoin transfer ever made. The blockchain is updated by "miners" who provide the computing power to confirm new Bitcoin transactions and who are paid a miner's fee in bitcoins for every new block of transactions that is added to the ledger. The blockchain is then updated for all Bitcoin users. Thus, in the decentralized, self-perpetuating, global Bitcoin network, every confirmed transfer necessarily affects interstate and foreign commerce.

The blockchain records, among other data, the public address to which bitcoins were sent. A public address is simply an alphanumeric string that bears no identifiers for who "controls" it. It is somewhat analogous to a bank account number, but with at least one crucial distinction in practice: A bank account number is useless unless paired with a routing number that identifies the financial institution that services the account, which in turn can identify the account holder. A Bitcoin public address is not, by design, hitched to a comparable source of identification.

A bitcoin is "possessed," that is, control over it is exercised, by whoever possesses the corresponding private key that is necessary to transfer bitcoins at a public address. Bitcoin users generally maintain these public-private key combinations in virtual "wallets." These wallets are not limited to a single public address; a wallet's owner can change the public address with every transaction. Therefore, no record of transactions associated with a particular wallet, and no pattern of transactions that may tend to identify the wallet's owner, can be readily gleaned from the blockchain alone. This decentralized system for

maintaining bitcoins and Bitcoin transactions affords users less traceability and greater anonymity than traditional methods of transmitting money.

B. **Background of the Defendant**

The defendant is on a 30-year term of supervised release in Case Number 06-CR-6007 from the Rochester Division of this District for a conviction of Knowingly Transporting Child Pornography in Interstate Commerce. He served five years in prison and commenced supervision on June 11, 2012. Among the special conditions of his supervision as listed in his judgment and sentence, the defendant "must provide the U.S. Probation Office advance notification of any computer(s), automated service(s), or connected device(s) that will be used during the term of supervision" and that "[a]s triggered by impermissible/suspicious activity, [he] shall consent to and cooperate with unannounced examinations of any computer equipment owned or used by [him]."

On October 20, 2015, the defendant completed a "Computer / Internet Data Form" that he submitted to his probation officer. At the top of the form was the instruction, "As a specific condition of supervision, you are required to provide your probation officer accurate information about your entire computer system and software; all passwords used by you; and your Internet Service Provider(s)." In response to the typewritten question, "Where do you most often use a computer?", the defendant handwrote, "I dont [sic] use a computer." In response to the typewritten question, "Estimate how many hours a week you are on the Internet?", the defendant handwrote, "N/A." The defendant signed the form,

acknowledging that a false statement on the form may result in a charge of false statements under Title 18, United States Code, Section 1001.

Contrary to his professed non-usage of a computer and the Internet, the defendant used both to operate his Bitcoin business. The defendant publicly advertised his money transmitting services on the website LocalBitcoins.com under the moniker "rich13598." LocalBitcoins.com allows users to post ads that offer to either sell or buy bitcoins in their respective geographic areas. The ads typically state the proposed exchange rate, preferred method of payment, and means of contact.[2]

The defendant posted two types of ads. One offered to sell bitcoins for cash in person; the other offered to sell bitcoins for remote payment, such as cash deposit into a bank account. This model gave him access to a customer base both inside and outside the Western District of New York. Among the customers in this District were two individuals referred to hereinafter as "C-1" and "C-2." C-1 was a Buffalo-based exchanger who had several hundred thousand dollars in transactions. The defendant sold over $50,000 in bitcoins to C-1 across 14 transactions between August 22, 2014, and October 15, 2015. C-2 was primarily a customer of C-1, but also sourced bitcoins from the defendant. C-2 bought over $100,000 in bitcoins to pay for marijuana on dark net markets.

---

[2]   LocalBitcoins.com allows for transactions to be executed both on and off the website. "On" means that the bitcoin is funded from a wallet on the website, the transaction uses the website's escrow system, and the transaction is administered through and logged on the website, which charges a fee for this service. "Off" means that users circumvent the website's escrow protection – and fees – by transacting offsite.

As for the defendant's remote customer base, between August 2014 and December 2015, he received 82 deposits into bank accounts to which he had access. These deposits included cash deposits in 11 states and totaled approximately $100,000. In a typical exchange, a customer sent fiat currency to him, then he transferred bitcoins to a public address designated by the customer, regardless of whether the customer or a third party may have controlled that address.

The defendant's transaction volume totaled over $200,000 in the 16 months encompassed within Count Two. Records maintained by the Financial Crimes Enforcement Network ("FinCEN") of the Department of the Treasury show that at no time did the defendant register with the Secretary of the Treasury as a money transmitting business. Nor did he appear to make any effort to mitigate his money laundering risk; on the night of his arrest in this case, he readily transferred approximately $13,000 in bitcoins for an undercover agent within minutes of their meeting in a coffee shop, without any attempt at customer identification, recordkeeping, or transaction reporting.

## LEGAL DISCUSSION

A.  **Statutory and Regulatory Framework**

Section 1960(b)(1) defines an "unlicensed money transmitting business" as a money transmitting business which affects interstate or foreign commerce in any manner or degree and which satisfies one of three additional requirements (only one of which involves a license). The applicable requirement in this case is § 1960(b)(1)(B), that the business failed to comply with the money transmitting business registration requirements under 31 U.S.C.

§ 5330 or regulations prescribed thereunder. Section 1960 does not define "business," but defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." See § 1960(b)(2). Section 1960 also does not define "transferring" or "funds."

As referenced in § 1960(b)(1)(B), § 5330 governs the registration of money transmitting businesses with the Secretary of the Treasury. See § 5330(a)(1). Under § 5330(d), a "money transmitting business" includes any "person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system"; is required to file reports under section 5313; and is not a depository institution.

Section 5313 governs the filing of reports on domestic coins and currency transactions. Under § 5313(a):

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

Under § 5312(a)(2)(R), a domestic financial institution includes any "person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in

9

facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system." This portion of the definition for a domestic financial institution under § 5312(a)(2)(R) is identical to the above-excerpted definition for a money transmitting business under § 5330(d). Thus, any such business would trigger the reporting duty under § 5313 "if, when, and as the transmitter does engage in currency transactions." United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 95 (D.D.C. 2008).

Applicable regulations prescribed under § 5330 are at Title 31, Parts 1010 and 1022 of the Code of Federal Regulations. 31 C.F.R. § 1010.11(ff) and (ff)(5)(A) define a "money services business" to include a "person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern," who "provides money transmission services." Such services means "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." See § 1010.11(ff)(5)(A). Such money services businesses must register with FinCEN. See § 1022.380(a). Failure to register is criminally punishable under 18 U.S.C. § 1960. See § 1022.380(e). Such money services businesses must also file currency transaction reports under various circumstances outlined in the regulations. See §§ 1022.300, et seq.

On March 18, 2013, FinCEN issued an interpretive guidance on virtual currencies. FinCEN posited that administrators and exchangers of convertible virtual currency are subject to its regulations as money transmitters. See FIN-2013-G001, available at https://fincen.gov/statutes_regs/guidance/html/FIN-2013-G001.html (last visited Aug.

17, 2016). On October 27, 2014, FinCEN published two administrative rulings on the regulation of virtual currency trading platforms and virtual currency payment systems. See FIN-2014-R011, available at https://www.fincen.gov/news_room/rp/rulings/html/FIN-2014-R011.html (last visited Aug. 17, 2016); FIN-2014-R012, available at https://www.fincen.gov/news_room/rp/rulings/html/FIN-2014-R012.html (last visited Aug. 17, 2016). Consistent with its 2013 position, FinCEN ruled that "[w]hen engaging in convertible virtual currency transactions as an exchanger, a person must register with FinCEN as a money transmitter, assess the money laundering risk involved in its non-exempt transactions, and implement an anti-money laundering program to mitigate such risk," as well as comply with various recordkeeping, reporting, and transaction monitoring requirements under FinCEN regulations.

**B.   Count Two properly charges the defendant for unlawfully operating a money transmitting business under 18 U.S.C. § 1960(b)(1)(B).**

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an "indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." "An indictment must be read to include facts which are necessarily implied by the specific allegations made." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992). Thus, "[a]n indictment must sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events." United States v. De La Pava, 268 F.3d 157, 162 (2d Cir. 2001). Where an indictment tracks the statutory language and specifies the nature of the criminal activity, it is sufficiently specific to withstand a motion to dismiss. United States v. Carr, 582 F.2d 242, 244 (2d Cir. 1978). The government is not required to

11

set forth evidentiary matter to preserve an indictment from a motion to dismiss. United States v. Harris, 805 F. Supp. 166, 172 (S.D.N.Y. 1992) (quoting Carr, 582 F.2d at 244).

In deciding a motion to dismiss an indictment, the Court is limited to determining whether the allegations of the indictment, taken as true and including all facts necessarily implied, are sufficient to establish a violation of the charged offense. See United States v. Sampson, 371 U.S. 75, 78-79 (1962). Under Rule 12(b), the Court generally does not determine the sufficiency of the evidence on the indictment. "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial, the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." United States v. Perez, 575 F.3d 164, 166-67 (2d Cir. 2009) (quoting United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998)). Whether the government possesses the evidence to support a charge is the issue for trial.

In this case, the defendant asserts that "[i]n the present case the Government has procured an Indictment by furnishing proof to the Grand Jury that [he] bought and sold the electronic currency known as a Bitcoin for his own personal benefit." Dkt. 23-1, ¶ 8. As a threshold matter, the government is not aware of how the defendant "knows" what proof of what conduct was furnished to the grand jury. No grand jury minutes or transcripts have been disclosed to the defendant. The government did disclose numerous documents, records, and other materials, but without any grand jury exhibit markings or otherwise distinguishing between what may or may not have been presented to the grand jury. The factual foundation for the defendant's motion, thus, starts with pure, unfounded conjecture

to which the government objects in accuracy and completeness. Such inadequate speculation provides no basis to dismiss a charge in a facially valid indictment.

The defendant next asserts that "what [he] did was the functional equivalent of selling any other chattel – e.g. a silver dollar, collectable currency, a diamond, gold jewelry, etc." Dkt. 23-1, ¶ 9. The defendant appears to be arguing that bitcoins are a commodity not within the scope of "money transmitting" under § 1960 (and presumably, therefore, Count Two fails to state an offense). This interpretation has no basis in either the nature of Bitcoin or the text of the statute. Dark net markets are not known to use a silver dollar as a widely accepted medium of exchange. Nor are ransomware programs generally known to demand payment in diamonds.[3] Unlike the "any other chattel" cited by the defendant, virtual currencies such as Bitcoin have no intrinsic value or purpose beyond serving as a means of transferring wealth.[4]

---

[3] Ransomware refers to malicious software ("malware") that a victim usually unwittingly installs on his computer system that effectively shuts access until a ransom is paid. This ransom is often demanded in virtual currency such as Bitcoin, where extortionists leverage the anonymity conferred by this funds transfer system to make tracking the payments difficult. See, e.g., Kim Zetter, Why Hospitals Are the Perfect Targets For Ransomware, Wired.com, https://www.wired.com/2016/03/ransomware-why-hospitals-are-the-perfect-targets/ (last visited Aug. 17, 2016) (discussing three ransomware attacks on healthcare providers in which one hospital paid $17,000 in bitcoins).

[4] Even the defendant would seem to have thought that bitcoins are not like the "any other chattel." He seemed to have readily reported to his probation officer while on supervised release that he worked as a clerk at his family's business, which apparently sold beer and other consumables. However, he hid his Bitcoin business from Probation for at least 16 months and lied to Probation, when caught during a Bitcoin transaction, about owning and using the tools of that trade (as charged in Count One of the Superseding Indictment).

In so evaluating what it is by what it does, Bitcoin is clearly "funds" that are transferred by a "money transmitting business." See United States v. Faiella, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014). Faiella involved a § 1960 indictment against two defendants who operated a Bitcoin exchange on Silk Road by receiving U.S. currency from customers and transferring the value of the funds in the form of bitcoins to the customers' Silk Road accounts for use on the market. Given the lack of a statutory definition for "funds," Faiella drew on the term's ordinary meaning and the statute's legislative history to find that Congress designed § 1960 to combat money laundering, to deter the use of nontraditional means of converting street currency into other forms to transmit drug proceeds. See id. Thus, the statute was meant to be flexible, to "keep pace with evolving threats," such as Bitcoin. Id. Courts that have considered other virtual currencies have reached the same conclusion. See, e.g., United States v. Budovsky, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015) (finding the "Liberty Reserve" virtual currency to be "funds" for § 1960); United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 88 (D.D.C. 2008) (same for "e-gold").

Lastly, the defendant asserts that "[t]here is no suggestion that [he] 'transmitted', or 'transferred' the money he procured from the sale of his Bitcoins on behalf of the public." Dkt. 23-1, ¶ 10. Any transfer or non-transfer of the defendant's fees, proceeds, or profits from selling bitcoins is irrelevant to Count Two. The transfer of the bitcoins is the service that the defendant performed on behalf of any paying member of the public, wherever situated, and his business of doing so is what is encompassed in Count Two. Under § 1010.11(ff)(5)(A), money transmitting occurs whenever a party accepts funds from a customer and transfers funds "to another location or person by any means." Due to the

purely digital nature of Bitcoin, the defendant necessarily transferred funds in the form of bitcoins to a location other than where he accepted or his customer rendered payment of funds in the form of fiat currency.

**C.    The defendant has given the Court no basis to find any prejudicial error before the grand jury that merits dismissal of Count Two.**

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988).  For prosecutorial misconduct to be such error meriting dismissal, that misconduct should amount to "a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" United States v. Williams, 504 U.S. 36, 46 (1992) (quoting United States v. Mechanik, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring)); see, e.g., United States v. Peralta, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) ("defendants were seriously prejudiced by the cumulative effect of the government's misleading statements of law and its use of inaccurate hearsay testimony").

Following his bare-bones claims that his conduct did not violate § 1960, the defendant asserts that the government "therefore had to have improperly characterized [his] conduct or the applicable law." Dkt. 23-1, ¶ 11.  The defendant levels this accusation without even alleging any specific, prejudicial error, much less one that rises to the level required by Williams.  As the moving party, he has failed to produce any fact or precedent that supports the extraordinary relief sought in this case.  The Court should not entertain such a motion that would have the Court and the government fish for reasons as to why the

15

motion has or lacks basis in fact and law. As demonstrated above, the defendant's assumption that Bitcoin transfers cannot constitute money transmitting under § 1960 is simply wrong as a matter of law. Without this faulty premise, he cannot logically deduce that some grand jury error led to his indictment.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion (Dkt. 23) to dismiss Count Two of the Superseding Indictment (Dkt. 16).

DATED: Buffalo, NY, August 17, 2016.

>  WILLIAM J. HOCHUL, JR.
>  United States Attorney
>
>  By:   s/WEI XIANG
>  Assistant United States Attorney
>  United States Attorney's Office
>  Western District of New York
>  138 Delaware Avenue
>  Buffalo, NY  14202
>  716/843-5806
>  Wei.Xiang@usdoj.gov