UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

                    v.

Richard Petix,

                              Defendant.

**Report and Recommendation**
15-CR-227A

## I.    INTRODUCTION

In Count Two of the superseding indictment that it has filed, the Government accuses

defendant Richard Petix ("Petix") of running an unlicensed money transmitting business in

violation of 18 U.S.C. § 1960.  The financial instrument at the heart of the alleged unlawful

business, however, is not cash, checks, notes, or other aspects of the United States monetary

system.  The financial instrument in question is the digital virtual currency known as Bitcoin.[1]

Does the transmission of Bitcoin come within the reach of Section 1960?

Petix says no and has filed a motion (Dkt. No. 23) to dismiss Count Two accordingly.  Petix

argues that Bitcoin is private property like precious metals and that he did not operate any business

connected to Bitcoin that would fall under Section 1960.  The Government counters that Bitcoin is

just the latest example of a medium of exchange that Section 1960 was written to regulate.

The Hon. Richard J. Arcara has referred this case to this Court under 28 U.S.C. § 636(b).

(Dkt. No. 4.)  The Court held oral argument on August 24, 2016.  After considering the parties'

arguments and papers including supplemental papers, the Court respectfully recommends granting

Petix's motion.

---

[1] Per convention, the Court will use the capitalized singular "Bitcoin" when referring to the virtual currency in general and the lowercase plural "bitcoins" when referring to units of the virtual currency.

## II.    BACKGROUND

This case concerns allegations that Petix lied to his probation officers about using computers, in particular using them in connection with the decentralized virtual currency known as Bitcoin. Petix's relationship with the USPO stemmed from a criminal conviction in this District for knowingly transporting child pornography in interstate commerce, in violation of 18 U.S.C. § 2252A(a)(1). (*See generally* Case No. 06-CR-6007.) On January 16, 2009, District Judge Charles J. Siragusa sentenced Petix to a term of imprisonment of 60 months and a term of supervised release of 30 years. (Dkt. No. 26-1 at 3.) As a special condition of supervision, Judge Siragusa required Petix to give the USPO advance notice of any computer usage and gave the USPO broad authority to manage that usage. (*Id.* at 4.) In October 2015, after his release, Petix filled out paperwork for the USPO pertaining to the special condition about computer usage. Among other information that Petix gave in that paperwork, he explicitly denied being a computer user. (Dkt. No. 1 at 4; Dkt. No. 26 at 3.) The paperwork contained a notice that false statements could lead to prosecution under 18 U.S.C. § 1001. (*Id.*)

As alleged by the Government, Petix's compliance with the special condition of release did not last long. Between August 2014 and December 2015, Petix engaged in numerous transactions involving the buying and selling of bitcoins. Given the nature of Bitcoin, Petix's transactions necessarily would have required the use of a computer; Petix also placed advertisements on a certain website—another activity that would involve computer use. (*See* Dkt. No. 24 at 7–8.) Law enforcement agents and the USPO eventually became aware of Petix's activity, in part through the use of undercover agents and confidential sources. (*See id.*) On December 3, 2015, agents and probation officers observed Petix at a local coffee shop using a computer and other electronic

devices.  (Dkt. No. 1 at 4; Dkt. No. 26 at 4–5.)  When the agents and probation officers

confronted Petix, he denied ownership of the devices, even when his girlfriend, sitting in a car

outside the coffee shop, confirmed his ownership.  (Dkt. No. 26 at 4–5.)  The open screen of the

computer displayed information indicating that Petix had just completed a transaction involving

37 bitcoins with a value, at the time, of approximately $13,000.  The agents and probation officers

took Petix into custody that evening.

      This Court saw Petix for the first time the next day.  The Court signed a criminal complaint

(Dkt. No. 1) accusing Petix of making false statements to the agents and probation officers in

violation of 18 U.S.C. § 1001(a)(2).   The Court ordered Petix detained in part because of supervised

release violation proceedings that had begun at the same time before Judge Siragusa.  (Dkt. No. 2.)

The Government filed an indictment on December 9, 2015.  (Dkt. No. 3.)  This original indictment

contained only one count of making a material false statement in violation of 18 U.S.C. §

1001(a)(2).  The Government filed a superseding indictment on March 9, 2016.  (Dkt. No. 16.)  The

superseding indictment contains two counts.  In Count One, the Government accuses Petix of

making a material false statement in violation of 18 U.S.C. § 1001(a)(2).  In Count Two, the

Government accuses Petix of running an unlicensed money transmitting business in violation of 18

U.S.C. § 1960.  The superseding indictment also contains a notice of forfeiture for electronic devices

seized on December 3, 2015 and a notice of intent to seek a money judgment.

      Petix filed omnibus pretrial motions on February 24, 2016.  (Dkt. No. 15.)  Petix withdrew

his motions to suppress (*see* Dkt. No. 30), and his non-dispositive motions will be addressed in a

separate Decision and Order.  The Court's focus here is on Petix's additional pretrial motion of

July 29, 2016, a motion to dismiss Count Two of the superseding indictment.  (Dkt. No. 23.)

Petix frames his motion with language about grand jury proceedings but really expresses two legal

challenges to Count Two.  Petix argues that what he allegedly did in Count Two "was the

functional equivalent of selling any other chattel—e.g. a silver dollar, collectable currency, a

diamond, gold jewelry, etc." (Dkt. No. 23-1 at 4.)  By proposing that the Court treat Bitcoin as

chattel, Petix effectively is arguing that Bitcoin is not "money" or "funds" as Section 1960 uses

those terms.  Additionally, Petix argues that what he allegedly did in Count Two does not

constitute "transmitting" or "transferring" the proceeds from sales of bitcoins as understood in

Section 1960.  (Id.)  In supplemental briefing, Petix develops this argument further by arguing that

his alleged conduct does not constitute a "business" that he was "operating" for purposes of

Section 1960.  (Dkt. No. 35 at 9, 11.)  The Government counters that Bitcoin qualifies as "funds"

under Section 1960 because "virtual currencies such as Bitcoin have no intrinsic value or purpose

beyond serving as a means of transferring wealth."  (Dkt. No. 24 at 13.)  The Government argues

further that what Petix allegedly did counts as a business that he operated because "[a]ny transfer

or non-transfer of the defendant's fees, proceeds, or profits from selling bitcoins is irrelevant to

Count Two.  The transfer of the bitcoins is the service that the defendant performed on behalf of

any paying member of the public, wherever situated, and his business of doing so is what is

encompassed in Count Two."  (Id. at 14.)

III.   DISCUSSION

   A.  *Motions to Dismiss Indictments Generally*

Petix is arguing that the Government's allegations in Count Two, taken at face value, do

not amount to a criminal offense.  The Court accordingly will review Petix's motion under Rule

12(b)(3)(B)(v), which allows for pretrial motions to dismiss indictments for "failure to state an offense." *See also United States v. Sampson*, 371 U.S. 75, 78–79 (1962) ("Of course, none of these charges have been established by evidence, but at this stage of the proceedings the indictment must be tested by its sufficiency to charge an offense.").  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.  It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.  Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117–18 (1974) (internal quotation marks and citations omitted).  "The court is limited, however, in what it may consider during this analysis.  Its determination must be based on whether the facts alleged in the indictment, if accepted as entirely true, state the elements of an offense and could result in a guilty verdict.  Generally speaking, it is a narrow, limited analysis geared only towards ensuring that legally deficient charges do not go to a jury." *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011) (citation omitted).

### B.  Bitcoin and Section 1960

Count Two of the superseding indictment consists of a violation of 18 U.S.C. § 1960. Section 1960 has two subsections, an operational subsection and a definitional subsection.  The

operational subsection appears simple enough: It runs one sentence long.  "Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both."  18 U.S.C. § 1960(a).  Analysis of the statute quickly becomes complicated, though; of all the terms and phrases used in the operational subsection, the definitional subsection partially defines only two of them.  For purposes of Section 1960, and ignoring language not relevant to this case, "the term 'unlicensed money transmitting business' means a money transmitting business which affects interstate or foreign commerce in any manner or degree and . . . fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section."  *Id.* § 1960(b)(1)(B).  The definitional subsection also addresses the term "money transmitting," but it does not truly define the term.  Whatever "money transmitting" is, the definitional subsection states only that it "*includes*[2] transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  *Id.* § 1960(b)(2) (emphasis added).  At its irreducible core, then, Section 1960 declares that, under the right conditions including deficiencies in licensing and registration, certain conduct involving "money" or "funds" is unlawful.  Section 1960 does not define "money"; the Government has acknowledged that "Section 1960 also does not define

---

[2] *See, e.g., Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle.") (citations omitted); *White v. Nat'l Football League*, 756 F.3d 585, 595 (8th Cir. 2014) ("While at times the expression of one thing excludes others not expressed, when a statute uses the word 'includes' rather than 'means' in defining a term, it does not imply that items not listed fall outside the definition.") (internal quotation and editorial marks and citations omitted).

'transferring' or 'funds.'" (Dkt. No. 24 at 9.)  Getting a better handle on the terms "money" and

"funds" is a good next step in the Court's analysis; as noted above, the Government has argued

explicitly that Petix's bitcoins themselves, and not any "fees, proceeds, or profits from selling

bitcoins," lie at the heart of Count Two.

### C.  Are Bitcoins "Money" or "Funds" Under Section 1960?

Defining the terms "money" and "funds" requires using a few principles of statutory

interpretation.  "Our first step in interpreting a statute is to determine whether the language at

issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  Our

inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent

and consistent.  The plainness or ambiguity of statutory language is determined by reference to the

language itself, the specific context in which that language is used, and the broader context of the

statute as a whole."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997) (internal quotation

marks and citations omitted).  When courts have to examine specific terms in statutes, and the

statutes do not provide definitions for those terms, judges will assign an ordinary, common-sense

meaning consistent with the broader context of the statute.  *EMI Christian Music Grp., Inc. v.

MP3tunes, LLC*, 840 F.3d 69 (2d Cir. 2016) (citations omitted).  "A 'common and ordinary'

meaning may include another statutory definition from a similar context, a dictionary definition,

or a common-law definition."  2A Norman Singer and Shambie Singer, *Sutherland Statutory

Construction* § 47:7 (7th ed. and 2016 Supp.) (citations omitted); *see also, e.g., Boumediene v. Bush*,

553 U.S. 723, 776 (2008) ("When interpreting a statute, we examine related provisions in other

parts of the U.S. Code.") (citations omitted); *Walters v. Metro. Educ. Enterprises, Inc.*, 519 U.S. 202,

207 (1997) ("In the absence of an indication to the contrary, words in a statute are assumed to

bear their ordinary, contemporary, common meaning.") (internal quotation marks and citation

omitted). Courts have to use caution when relying solely on dictionary definitions of terms that

ordinary people in everyday life would understand in a different way. "Whether a statutory term is

unambiguous, however, does not turn solely on dictionary definitions of its component words . . . .

Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the

same words, placed in different contexts, sometimes mean different things." *Yates v. United States*,

135 S. Ct. 1074, 1081–82 (2015) (citations omitted).

Taking the two undefined terms in Section 1960 in reverse order, the Supreme Court

already has applied the above principles of interpretation to the term "funds." "The ordinary

meaning of 'fund[s]' is 'sum[s] of money . . . set aside for a specific purpose.'" *Clark v. Rameker*, ___

U.S. ___, 134 S. Ct. 2242, 2246 (2014) (ellipsis and brackets in original) (citation omitted). The

Supreme Court happened to look at a dictionary to define "funds" in *Clark*, but consistent with

the principle expressed in *Yates*, that definition aligns with how ordinary people would understand

that term. The Supreme Court's understanding of "funds" also is consistent with legislative

materials that use the term in similar or analogous contexts. For example, when the House of

Representatives prepared a report for the proposed Financial Anti-Terrorism Act of 2001, it

discussed "funds" that supported terrorism using examples such as cash, checks, credit cards, and

"seed money." H.R. Rep. 107-250(I), 2001 WL 1249988, at *34 (2001). The civil forfeiture

statute, 18 U.S.C. § 981, treats the term "funds" as something that, *inter alia*, can be deposited in

established and regulated financial institutions. Some of the banking statutes use the term "funds"

to describe something that can be deposited into and withdrawn from the United States Treasury. *See generally, e.g.*, 12 U.S.C. § 1735.  From one source to another, the exact meaning of "funds" might change a little, but the uses of the term in the United States Code and in everyday life have in common the description that the Supreme Court used: designated or allocated sums of money.

The ordinary understanding of "funds," with its reference to "money," necessarily brings the Court to an assessment of that other term.  Legal authorities abound with uses of the term "money."  The Constitution gave Congress the enumerated power "[t]o coin Money, [and to] regulate the Value thereof."  U.S. Const. art. I, § 8, cl. 5.  The United States Code, under a subchapter titled "Monetary System," has a definition of legal tender that covers coins, currency, and notes.  31 U.S.C. § 5103.  Another provision of Title 31 refers to "money" and "public money" as something that can be deposited in the United States Treasury.  31 U.S.C. § 3302.  A portion of the tax code refers to estate transfers that occur "for a consideration in money or money's worth."  26 U.S.C. § 2043.  Portions of the judicial code refer to "receiving and paying over money" compared to "disposing of such property," 28 U.S.C. § 1921(c)(1); and to plural "moneys paid into any court of the United States," 28 U.S.C. § 2041.  Countless other examples exist, written before and after Section 1960, and of course the exact use of the term "money" will vary somewhat across very different statutes and cases.

What all of the above examples have in common, though, is the involvement of a sovereign.  Across all of the legal authorities that make some reference to money, and despite new technologies that have emerged over the years within the United States monetary system, there has been a consistent understanding that money is not just any financial instrument or medium of

exchange that people can devise on their own.  "Money," in its common use, is some kind of

financial instrument or medium of exchange that is assessed value, made uniform, regulated, and

protected *by sovereign power*.  *See, e.g.,* David G. Oedel, *Why Regulate Cybermoney?*, 46 Am. U. L. Rev.

1075, 1077 (1997) ("[I]n the background of most functional definitions are suggestions that money

serves as a tool for governments to exercise macroeconomic control and to channel financial

commerce along preferred routes.") (citations omitted).  Ordinary people in everyday life know this

intuitively; the average person who hears the term "money" will think of government-issued

"dollars" or instruments, like checks, money orders, credit cards, or notes, directly connected to

dollars.  *Cf. Nix v. Hedden*, 149 U.S. 304, 307 (1893) (giving "the common language of the people"

priority over scientific definitions, for purposes of statutory construction).  The Supreme Court

years ago expressed the ordinary understanding of money as a regulated instrument when, quoting

Blackstone, it wrote that "[t]he coining of money is the act of the sovereign power, *that its value may

be known on inspection.*"  *Legal Tender Cases*, 79 U.S. 457, 491 (1870) (emphasis in original),

*abrogated in part on other grounds by Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535

U.S. 302, 326 n.21 (2002).  The Ninth Circuit once wrote a succinct yet fairly comprehensive

description of how money draws its usefulness from governmental authority:

> The broad and comprehensive national authority over the subjects of revenue,
> finance and currency is derived from the aggregate of the powers granted to the
> Congress, embracing the powers to lay and collect taxes, to borrow money, to
> regulate commerce with foreign nations and among the several states, to coin
> money, regulate the value thereof, and of foreign coin, and fix the standards of
> weights and measures, and the added express power to make all laws which shall be
> necessary and proper for carrying into execution the other enumerated powers.
> The constitution was designed to provide the same currency, having a uniform legal
> value in all the States.  It was for that reason that the power to regulate the value of
> money was conferred upon the federal government, while the same power, as well

10

> as the power to emit bills of credit, was withdrawn from the states. The states cannot declare what shall be money, or regulate its value. Whatever power there is over the currency is vested in the Congress. The power includes [t]he authority to impose requirements of uniformity and parity (which) is an essential feature of this control of the currency. The Congress is authorized to provide a sound and uniform currency for the country, and to secure the benefit of it to the people by appropriate legislation.

*Laycock v. Kenney*, 270 F.2d 580, 590 (9th Cir. 1959) (internal quotation marks and citations omitted). Criminal monetary statutes exist in part to protect a uniform, regulated monetary system; that is, they aim to prevent any implicit lending of sovereign power or legitimacy to criminal enterprises. *Cf., e.g., United States v. Fernando*, 745 F.2d 1328, 1330 (10th Cir. 1984) ("Thus, it may be fair to assume that Congress, perceiving the possibility that misuse of currency could occur more easily, intended the scope of § 649 to be restricted to currency only and not to include negotiable documents. Finally, the existence of other criminal statutes, such as 18 U.S.C. § 641, which has a scope clearly broad enough to make criminal any conversion to personal use of checks as well as money, persuades us that a broad reading of the term 'money' is not imperative."); Lawrence Trautman, *Virtual Currencies; Bitcoin & What Now After Liberty Reserve, Silk Road, and Mt. Gox?*, 20 Rich. J.L. & Tech. 13 (2014) (noting that part of the mission of the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") "is to safeguard the financial system from illicit use"); Oedel, 46 Am. U. L. Rev. at 1084 ("In its traditional forms, money gives to its users the chance to buy or sell valuables more quickly and more anonymously than in a barter economy. This feature may be useful not only to legitimate businesspersons seeking to streamline commerce, but also to parties hoping to hide illegal transactions, illicit sources of funding, and taxable income from public scrutiny. To prevent the use of money for such fraudulent purposes, governments sometimes oblige financial institutions to report unusual

cash transactions and to disclose monetary flows that appear to be linked to fraudulent activities.")
(citations omitted).

The above context demonstrates that Bitcoin is not "money" as people ordinarily understand that term.  Bitcoin operates as a medium of exchange like cash but does not issue from or enjoy the protection of any sovereign; in fact, the whole point of Bitcoin is to escape any entanglement with sovereign governments.  Bitcoins themselves are simply computer files generated through a ledger system that operates on block chain technology.  *See, e.g.,* Shahla Hazratjee, *Bitcoin: The Trade of Digital Signatures*, 41 T. Marshall L. Rev. 55, 59 (2015) ("The Bitcoin system operates as a self-regulated online ledger of transactions.  These transactions are currently denoted by the change of ownership in Coins.  This ledger, also referred to as the 'block chain,' has certain built-in mechanisms that eradicate the risk of double spending or tampering with the master record of all transactions.").  Like marbles, Beanie Babies™, or Pokémon™ trading cards, bitcoins have value exclusively to the extent that people at any given time choose privately to assign them value.  No governmental mechanisms assist with valuation or price stabilization, which likely explains why Bitcoin value fluctuates much more than that of the typical government-backed fiat currency.  *See, e.g.,* Jennifer R. Bagosy, *Controversial Currency: Accepting Bitcoin As Payment for Legal Fees*, Orange County Lawyer, June 2014, at 42 ("Bitcoin has other key features that make it very different from other methods of payment.  First, the value of Bitcoin is highly volatile.  In January 2013, one Bitcoin was worth about $13.  By December 4, 2013, the price had skyrocketed to $1,061 per Bitcoin.  By April 15, 2014, the value had dropped to $500 per Bitcoin.") (citation omitted).  As for experiences in daily life, ordinary people do not receive salaries in bitcoins,

12

cannot deposit them at their local banks, and cannot use them to pay bills.  The Court cannot rule

out the possibility that widespread, ordinary use of bitcoins as money could occur someday, but

that simply is not the case now:

> Bitcoin may have some attributes in common with what we commonly refer
> to as money, but differ in many important aspects.  While Bitcoin can be
> exchanged for items of value, they are not a commonly used means of exchange.
> They are accepted by some but not by all merchants or service providers.  The value
> of Bitcoin fluctuates wildly and has been estimated to be eighteen times greater
> than the U.S. dollar.  Their high volatility is explained by scholars as due to their
> insufficient liquidity, the uncertainty of future value, and the lack of a stabilization
> mechanism.  With such volatility they have a limited ability to act as a store of
> value, another important attribute of money.

*State v. Espinoza*, No. F14-2923, slip op. at 5–6 (Fla. 11th Judicial Cir. Ct. July 22, 2016)

(unpublished decision), http://www.miamiherald.com/news/local/crime/article91785802.ece/

BINARY/Read the ruling (.PDF) (last visited Dec. 1, 2016).

The ordinary understanding of money, and Bitcoin's status outside of that understanding,

bring the Court back to the case at hand.  The Government's aphorisms aside (Dkt. No. 24 at 2),

there might be ways to prosecute Petix if he had conspired with others to engage in activity that

violated other criminal statutes.  Here, though, and as noted above, the Government has chosen to

focus on the transfer of bitcoins in itself.  The Government's theory of prosecution requires

treating Bitcoin as money in the ordinary understanding of that term.  Because Bitcoin does not fit

an ordinary understanding of the term "money," Petix cannot have violated Section 1960 in its

current form.  As a matter of law, then, Count Two fails no matter what amount of factual

evidence the Government might have at its disposal.

The principal authorities that the Government has cited do not change the above analysis.

*United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008), did not attempt to define the terms

"money" or "funds," and neither did the FinCEN regulations cited in the Government's papers. In *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014)—*a.k.a.* the "Silk Road case"—the court turned directly to a dictionary to define both "money" and "funds" and then equated an ordinary understanding of those terms with the dictionary definitions. *Accord United States v. Budovsky*, No. 13CR368 DLC, 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015); *United States v. Murgio*, No. 15-CR-769 (AJN), 2016 WL 5107128 (S.D.N.Y. Sept. 19, 2016). Perhaps there were circumstances in that line of Southern District cases that justified a first and exclusive resort to a dictionary. "Dictionary definitions of 'money,' however, are not helpful in determining congressional intent in employing that term in [a criminal statute]." *United States v. Jackson*, 759 F.2d 342, 344 (4th Cir. 1985). As the Court noted above, there are several problems with a straight dictionary approach. First, a dictionary approach overlooks the numerous times in the United States Constitution and Code when the term "money" consistently has referred to some kind of instrument issued and regulated by a sovereign. Second, the approach does not address the Supreme Court's determination of the ordinary meaning of the term "funds." Third, as the Supreme Court noted in *Yates*, terms in ordinary life do not always line up with dictionary definitions, and ordinary people simply would not think of any private medium of exchange as money. Finally, resorting exclusively to a dictionary does not address the desire, implicit in Section 1960, to keep the United States monetary system away from criminal activity and transactions that support it. The weight of those authorities, experiences, and statutory objectives must be allowed to control here over broad technical definitions that lack context.

14

To be clear, the Court reminds the parties that it is only interpreting the language of Section 1960 in its current form.  The Court takes no position on whether and how Congress should amend Section 1960 to define "money" and "funds" for purposes of that section.  The Court also takes no position on the deeper issue of whether block chain technology and virtual currencies should be fit into existing regulatory schemes, as opposed to devising new schemes to address a completely new technology.  Given the options available for future regulation, any discussion about regulating virtual currencies is best left to the political process.  *Compare, e.g.,* Carla L. Reyes, *Moving Beyond Bitcoin to an Endogenous Theory of Decentralized Ledger Technology Regulation: An Initial Proposal*, 61 Vill. L. Rev. 191, 228 (2016) (proposing an iterative "regulation-through-code" approach to block chain technology) *with* Petter Hurich, *The Virtual is Real: An Argument for Characterizing Bitcoins as Private Property*, 31 B.F.L.R. 573 (2016) (proposing that bitcoins be regulated as private property).

Since Count Two fails for the reasons discussed above, the Court need not address the parties' arguments about whether Petix's alleged conduct constituted an operation of a business.  The Court also need not address whether the grand jury received incorrect legal instructions pertaining to Section 1960.  *See United States v. Smith*, 105 F. Supp. 3d 255, 260 (W.D.N.Y. 2015) ("As an initial matter, the Government is not required to provide a grand jury with legal instructions.  However, courts have found error where the government incompletely or erroneously provides legal instruction to the grand jury.") (internal quotation marks and citations omitted).

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Petix's

motion (Dkt. No. 23) to dismiss Count Two of the superseding indictment.

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by

electronic filing on the date below.  Any objections to this Report and Recommendation must be

electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP

59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's

report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003)

(citations omitted).

SO ORDERED.

_____*/s Hugh B. Scott*_____.
Honorable Hugh B. Scott
United States Magistrate Judge

DATED: December 1, 2016

16