IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

        v.                                             15-CR-227-CJS-HBS

RICHARD PETIX,

                 Defendant.

_____

## GOVERNMENT'S OBJECTION TO
## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION TO DISMISS COUNT TWO

THE UNITED STATES OF AMERICA, by and through its attorneys, James P. Kennedy, Jr., Acting United States Attorney for the Western District of New York, Wei Xiang, Assistant United States Attorney, of counsel, hereby files its objection to the Report and Recommendation of the Magistrate Court (Dkt. 36) on the defendant's motion (Dkt. 23) to dismiss Count Two of the Superseding Indictment (Dkt. 16).

Title 18, United States Code, Section 1960 prohibits certain conduct relating to "money transmitting," which "includes transferring funds on behalf of the public by any and all means . . ." § 1960(b)(2). Count Two charges the defendant with operating a money transmitting business in violation of § 1960(a) as follows:

> Beginning in or before August 2014, the exact date being unknown to the Grand Jury, and continuing until on or about December 3, 2015, in the Western District of New York, and elsewhere, the defendant, RICHARD PETIX, did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, as that term is defined in Title 18, United States Code, Section 1960(b)(1)(B), which failed to

comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330 and the regulations prescribed thereunder, and which affected interstate and foreign commerce in any manner and degree.

The charged conduct involves the defendant's transfers of bitcoins, a "virtual currency." In its Report and Recommendation, the Magistrate Court concluded, as a matter of law, that "funds" under § 1960 must be government-issued and cannot include a non-sovereign medium of exchange such as Bitcoin. The Magistrate Court rejected the holdings in a line of cases from the United States District Court for the Southern District of New York that interpreted § 1960 based on its plain text, purpose, and legislative history to include bitcoins. The basis for the Southern District holdings is the correct reading of § 1960; while they might not be binding precedent, they are considerably more persuasive in their analysis than the inapplicable authorities cited by the Magistrate Court. The Report and Recommendation erroneously rejected such analysis and should, therefore, be itself rejected by this Court.


PROCEDURAL HISTORY

On December 4, 2015, the defendant was arrested and charged by criminal complaint for violating Title 18, United States Code, Section 1001(a)(2) (making material false statements) during his encounter on December 3, 2015, with agents of Homeland Security Investigations ("HSI") and officers of the United States Probation Office for this District. See Dkt. 1. On December 9, 2015, he was indicted for this charge in a one-count indictment. See Dkt. 3. On March 9, 2015, a superseding indictment added Count Two, recited above. See Dkt. 16.

On July 29, 2016, the defendant filed the instant motion to dismiss Count Two. See Dkt. 23. The defendant claimed that Count Two merits dismissal under Rule 12(b)(3)(A)(v) of the Federal Rules of Criminal Procedure for an error in the grand jury proceeding and under Rule 12(b)(3)(B)(v) for failure to state an offense, arguing, in part, that bitcoins are chattel and not funds under § 1960. See Dkt. 23. Following the government's response (Dkt. 24) and oral argument, the Magistrate Court granted the defendant's request for leave to file supplemental briefing. See Dkts. 30, 33. That supplemental memorandum focused on whether the defendant operated a business, not whether bitcoins constituted funds. See Dkt. 35. Upon the filing of the defendant's supplemental memorandum, the Magistrate Court took under advisement his motion to dismiss Count Two. See Dkt. 33.

On December 1, 2016, the Magistrate Court issued its Report and Recommendation. First, the Magistrate Court found that the term "funds" has already been defined by the United States Supreme Court in Clark v. Rameker, 134 S. Ct. 2242, 2246 (2014), without explaining the context, and rejected the definitions by the courts in United States v. Faiella, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014), United States v. Budovsky, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015), and United States v. Murgio, __ F. Supp. 3d __, 2016 WL 5107128, at *3-4 (S.D.N.Y. Sept. 19, 2016), which specifically applied § 1960 to virtual currencies, including Bitcoin. Dkt. 36 pp.8, 14. Armed with its definition of "funds" as "sums of money set aside for a specific purpose," the Magistrate Court then decreed that "'[m]oney,' in its common use, is some kind of financial instrument or medium of exchange that is assessed value, made uniform, regulated, and protected by sovereign power. Id. at p.10 (emphasis in original). Thus, according to the Magistrate Court, "money," and, by extension,

"funds" under § 1960, could not be read to include privately established payment systems such as Bitcoin.  Id. at pp.12-13.  Based on this statutory interpretation, and without reaching other issues, the Magistrate Court recommended dismissal of Count Two for failure to state an offense.  See id. at pp.4-5, 13, 15.  This timely objection ensues.

STANDARD OF REVIEW

Title 28, United States Code, Section 636(b)(1)(B) enables the Magistrate Court, upon referral, to conduct hearings and submit to this Court proposed findings of fact and recommendations of law for dispositive matters, including motions to dismiss charges.  The same section requires the District Court to make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  The District Court may accept or modify, in whole or in part, the finding or recommendations made by the Magistrate Court, or receive further evidence or recommit the matter to the Magistrate Court with instructions.  See § 636(b)(1).  In making its independent determination, "[i]t is sufficient that the district court 'arrive at its own, independent conclusion about those portions of the magistrate's report to which objection is made . . . .' To this end, the court must 'exercise . . . sound judicial discretion with respect to whether reliance should be placed on [the magistrate's] findings.'"  Nelson v. Smith, 618 F. Supp. 1186, 1189-90 (S.D.N.Y. 1985) (internal citations omitted).

<u>BACKGROUND</u>

**A.      <u>Statutory and Regulatory Framework</u>**

Title 18, United States Code, Section 1960 was created as part of an anti-money laundering effort, "designed to prevent the movement of funds in connection with drug dealing." <u>United States v. Faiella</u>, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014) (quoting <u>United States v. Bah</u>, 574 F.3d 106, 112 (2d Cir. 2009)). Originally enacted via the Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102-550, § 1512, 106 Stat. 3672, 4057-58 (1992), the statute's current form (as charged in Count Two) came through the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 (hereinafter "the Act"), in the aftermath of the September 11, 2001, terrorist attacks on the United States. <u>See</u> USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 296, 339. According to the House Committee on Financial Services report on the bill that would be incorporated into the Act, the purpose of the Act was to "provide[] the United States government with new tools to combat the financing of terrorism and other financial crimes." H.R. Rep. No. 107-250, at 33 (2001). The following was cited as among the need for legislation:

> Despite evidence suggesting [Osama] Bin Laden and Al Qaeda utilize formal banking relationships as part of their global financial network, experts believe that a major share of terrorist financing is conducted through international cash couriers as well as through informal banking systems, like the ancient South Asian money exchange system called hawala. The latter consists of an international network of non-bank financial agents, often built on trusted family or cultural relationships. In most cases, the funds themselves are never transferred, just messages relating to receipt or disbursement of funds. These underground systems are exploited by terrorists and other financial criminals because of the lack of record-keeping and opportunity for anonymity.

<u>Id.</u> at 34. Thus, the Act amended numerous statutes, including § 1960, to help identify, trace, and track the flow of illicit wealth, both derived from and intended to promote unlawful activity, through informal funds transfer systems.

Section 1960(b)(1) defines an "unlicensed money transmitting business" as a money transmitting business which affects interstate or foreign commerce in any manner or degree and which satisfies one of three additional requirements (only one of which involves a license). The applicable requirement in this case is § 1960(b)(1)(B), that the business failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 or regulations prescribed thereunder. Section 1960 does not define "business," but defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." See § 1960(b)(2). Section 1960 also does not define "transferring" or "funds."

As referenced in § 1960(b)(1)(B), § 5330 governs the registration of money transmitting businesses with the Secretary of the Treasury. See § 5330(a)(1). Under § 5330(d), a "money transmitting business" includes any "person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system," is required to file reports under section 5313, and is not a depository institution.

Section 5313 governs the filing of reports on domestic coins and currency transactions. Under § 5313(a):

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in

> the transaction the Secretary may prescribe shall file a report on the transaction
> at the time and in the way the Secretary prescribes.

Under § 5312(a)(2)(R), a domestic financial institution includes any "person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system."  This portion of the definition for a domestic financial institution under § 5312(a)(2)(R) is identical to the above-excerpted definition for a money transmitting business under § 5330(d).  Thus, any such business would trigger the reporting duty under § 5313 "if, when, and as the transmitter does engage in currency transactions." United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 95 (D.D.C. 2008).


Applicable regulations prescribed under § 5330 are at Title 31, Parts 1010 and 1022 of the Code of Federal Regulations.  31 C.F.R. § 1010.11(ff) and (ff)(5)(A) define a "money services business" to include a "person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern," who "provides money transmission services."  Such services means "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."  See § 1010.11(ff)(5)(A).  Such money services businesses must register with FinCEN.  See § 1022.380(a).  Failure to register is criminally punishable under 18 U.S.C. § 1960.  See § 1022.380(e).  Such money services businesses must also file currency transaction reports under various circumstances outlined in the regulations.  See §§ 1022.300, et seq.

## B.     Background of Bitcoin

Commonly called a virtual currency, Bitcoin is an electronic medium of exchange that exists as entries on a distributed "blockchain" ledger.  This blockchain records all Bitcoin transactions ever "made" by documenting, among other data, the number of bitcoins transferred from one "public address" to another.  A public address is an alphanumeric string that bears no identifiers for who "controls" it.  It is somewhat analogous to a bank account number, but with at least one crucial distinction in practice:  A bank account number is useless unless paired with a routing number that identifies the financial institution that services the account, which in turn can identify the account holder.  A Bitcoin public address is not, by design, hitched to a comparable source of identification, and thus tends to anonymize its use.

Bitcoin is not known to be created by any sovereign state, nor are bitcoins issued as legal tender.  Bitcoins are "mined" when the blockchain is updated by "miners" who provide the computing power to "confirm" new Bitcoin transactions.  The Bitcoin program pays out a miner's fee in bitcoins for new transactions that are recorded on the blockchain, which is then updated for all Bitcoin users.

Bitcoin is a "convertible" virtual currency.  It has an equivalent value in fiat currency, acts as a substitute for fiat currency, and can be exchanged for fiat currency.  The exchange rate for Bitcoin is not determined by any authority or entity, for example, in the way that the Chinese yuan was once "pegged" at 8.28 to the United States dollar.[1]  Rather, the value of

---

[1]     Peter S. Goodman, China Ends Fixed-Rate Currency, Wash. Post, July 22, 2005, at http://www.washingtonpost.com/wp-dyn/content/article/2005/07/21/AR20050721003-51.html (last visited Dec. 14, 2016).

the bitcoin is determined on the open market, with a "floating" exchange rate like many fiat currencies. During the period charged in Count Two, the equivalent value of a bitcoin in United States dollars fluctuated between approximately $200 and $600.

A bitcoin is "possessed," that is, control over it is exercised, by whoever possesses the corresponding private key that is necessary to transfer bitcoins at a public address. Bitcoin users generally maintain these public-private key combinations in virtual "wallets." These wallets are not limited to a single public address; a wallet's owner can change the public address with every transaction. Therefore, no record of transactions associated with a particular wallet, and no pattern of transactions that may tend to identify the wallet's owner, can be readily gleaned from the blockchain alone. This decentralized system for maintaining bitcoins and Bitcoin transactions affords users less traceability and greater anonymity than traditional methods of transmitting money.

These characteristics have popularized the use of Bitcoin in certain contexts, including various Internet-based markets. Vendors on a succession of "dark net" markets such as Silk Road, Agora, and AlphaBay Market offer a broad selection of goods and services. For example, a March 2016 perusal of AlphaBay Market revealed 15,737 listings under the category "Fraud" and 74,105 listings under "Drugs & Chemicals." Commerce on these markets is widely conducted through payment in virtual currencies; Bitcoin is a preferred and sometimes sole method of payment accepted on leading dark net markets.[2] Customers turn

---

[2]     To illustrate, attached as Exhibit 1 is a redacted screenshot of a listing for a set of controlled substances on AlphaBay Market. Although purchase price is denominated in dollars ($999.97), payment is requested in bitcoins (2.4009 BTC).

to Bitcoin exchangers to transfer funds from the physical world as fiat currency to the virtual world as bitcoins.  Vendors who receive payment in bitcoins also turn to Bitcoin exchangers to convert the bitcoins back to fiat currency.  In "selling" bitcoins to the customers, who pay the bitcoins to the vendors, who then "cash out" the bitcoins, these exchangers or series of exchangers effectively "recirculate" the virtual currency that makes this commerce flow.  Count Two of the Superseding Indictment charges the defendant for his conduct as a Bitcoin exchanger in this shadow financial system.

ARGUMENT

**A.    Congress wrote § 1960 to apply broadly, and for the term "funds" to include virtual currencies such as Bitcoin.**

"Statutory interpretation must begin with the plain language, giving all undefined terms their ordinary meaning while attempting to ascertain how a reasonable reader would understand the statutory text, considered as a whole."  Kirschenbaum v. 650 Fifth Ave. & Related Props., 830 F.3d 107, 135 (2d Cir. 2016).  Dictionaries that were in use at or around the time that Congress enacted the statute containing the undefined terms are an appropriate starting point for such ordinary meaning.  See Cont'l Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor, 782 F.3d 102, 109 (2d Cir. 2015) (quoting Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997, 2002 (2012)).

The meaning of a statutory term, "however, does not turn solely on dictionary definitions of its component words."  Yates v. United States, 135 S. Ct. 1074, 1081 (2015).  "Because the meaning of language is inherently contextual," Moskal v. United States, 498 U.S. 103, 108 (1990), courts "interpret the relevant words not in a vacuum, but with reference

to the statutory context, structure, history, and purpose," and common sense.  Abramski v. United States, 134 S. Ct. 2259, 2267 (2014).  When caught between two possible definitions of a statutory term, one broader than the other in scope, a court looks to the statute's basic purpose and legislative history for guidance.  See Muscarello v. United States, 524 U.S. 125, 132 (1998) (in interpreting 18 U.S.C. § 924(c), "conclud[ing] that neither the statute's basic purpose nor its legislative history support circumscribing the scope of the word 'carry' by applying an 'on the person' limitation").  For a statute that Congress clearly intended to apply broadly, reading a term narrowly, and thereby narrowing the scope of the statute, would be a misinterpretation.  See id. at 132-33.

The plain text of § 1960 defines "money transmitting" to "include[] transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  See § 1960(b)(2).  Although the statute does not define "funds," it provides that "funds" may be transferred by wire, check, draft, facsimile, or courier, among unlimited other means.  Thus, § 1960, on its face, makes clear that Congress intended no limitations on the form that funds may take, whether electronic, physical, or otherwise.  Nor does § 1960 express or imply any limitation, such as denomination in fiat currency, on the ordinary meaning of "funds."

Two authoritative dictionaries that were published around the time of the passage of the Act both support a broad understanding of "funds."  "The ordinary meaning of 'funds,' according to Webster's Dictionary, is 'available pecuniary resources,'" United States v. Murgio, __ F. Supp. 3d __, 2016 WL 5107128, at *3 (S.D.N.Y. Sept. 19, 2016) (quoting

Webster's Third New International Dictionary 921 (2002)), "ordinarily including cash and negotiable paper that can be converted to cash at any time without loss." Webster's Third New International Dictionary 921. The same dictionary defines "pecuniary" as "taking the form of or consisting of money" and "money" as "something generally accepted as a medium of exchange, a measure of value, or a means of payment." Murgio, 2016 WL 5107128, at *3 (quoting Webster's Third New International Dictionary 1458, 1663).

Similarly, according to the American Heritage Dictionary, the primary definition of the noun "funds" (not simply as the plural form of the noun "fund") is "available money; ready cash." American Heritage Dictionary 712 (4th ed. 2000). The primary definition of "money" is, in turn, "[a] medium that can be exchanged for goods and services and is used as a measure of their values on the market, including among its forms a commodity such as gold, an officially issued coin or note, or a deposit in a checking account or other readily liquifiable [sic] account." Id. at 1135.

These broad definitions and the broad scope of the Act make clear that "funds" as contemplated in § 1960 include virtual currencies such as Bitcoin. See United States v. Faiella, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014). Faiella involved a § 1960 indictment against two defendants who operated a Bitcoin exchange on the Silk Road market. Id. The exchange received fiat currency from customers and transferred the funds as bitcoins to the customers' Silk Road accounts for use on the market. Id. Finding that "Bitcoin can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions," Faiella held that "Bitcoin clearly qualifies as 'money' or

'funds' under the[] plain meaning [dictionary] definitions." Id.; accord Murgio, 2016 WL 5107128, at *4.

Faiella found this reading to be consistent with the purpose of § 1960. See 39 F. Supp. 3d at 545-46. According to the statute's legislative history, Congress designed § 1960 to combat money laundering, including to deter the use of nontraditional means of converting street currency into other forms to transmit drug proceeds. Id.; accord Murgio, 2016 WL 5107128, at *4 ("From its inception . . . , § 1960 sought to prevent innovative ways of transmitting money illicitly."). Thus, the statute was meant to be flexible, to "keep pace with evolving threats," such as Bitcoin. Id. Courts that have considered other virtual currencies have likewise concluded that Congress intended § 1960 to capture, not ignore, similar means of wealth transfer. See, e.g., United States v. Budovsky, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015) (finding the "Liberty Reserve" virtual currency to be "funds" for § 1960); United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 88 (D.D.C. 2008) (same for "e-gold").

The defendant's comparison of bitcoins to "any other chattel – e.g. a silver dollar, collectable currency, a diamond, gold jewelry, etc.," Dkt. 23-1, ¶ 9, and the Magistrate Court's comparison to "marbles, Beanie Babies™, or Pokémon™ trading cards," Dkt. 36 p.12, ignore the existential difference between bitcoins and these commodities. Dark net markets are not known to use a silver dollar as a widely accepted medium of exchange. Nor are ransomware programs generally known to demand payment in diamonds.[3] Unlike the "any other chattel"

---

[3]    Ransomware refers to malicious software ("malware") that a victim usually unwittingly installs on his computer system that effectively shuts access until a ransom is paid. This ransom is often demanded in virtual currency such as Bitcoin, where extortionists

cited by the defendant and the Magistrate Court, virtual currencies such as Bitcoin have no intrinsic value or purpose beyond serving as a means of transferring wealth. See United States v. Ulbricht, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Indeed, the only value for Bitcoin lies in its ability to pay for things—it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case. . . . Sellers using Silk Road [on which the only accepted form of payment was Bitcoin] are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them.").[4]

## B. The Magistrate Court's narrow construction of § 1960 was erroneous.

The Magistrate Court incorrectly prioritized form over substance when it placed undue emphasis on Bitcoin's implementation over its function as a medium of exchange in concluding that it falls beyond the scope of § 1960. The Report and Recommendation made much ado about Bitcoin's digital existence that is not government issued or maintained. The Magistrate Court looked to inapplicable law for guidance and failed to recognize the scope of § 1960 through its rightful context.

---

leverage the anonymity conferred by this funds transfer system to make tracking the payments difficult. See, e.g., Kim Zetter, Why Hospitals Are the Perfect Targets For Ransomware, Wired.com, https://www.wired.com/2016/03/ransomware-why-hospitals-are-the-perfect-targets/ (last visited Dec. 14, 2016) (discussing three ransomware attacks on healthcare providers in which one hospital paid $17,000 in bitcoins).

[4] Were bitcoins so volatile, illiquid, and incapable of holding value as the Magistrate Court derides, Dkt. 36 pp.12-13, then dark net vendors would all be money-losing ventures that give away valuable goods and services for bunk. Commerce on the markets, and common sense, show that is simply not the case.

1. **Importing a definition for "funds" as used to define "retirement funds" in the Bankruptcy Code and drawing inferences about the definition of "money" from similarly misplaced contexts are not suitable for construing § 1960.**

The government does not dispute the principle cited by the Magistrate Court that "[i]n law as in life, . . . the same words, placed in different contexts, sometimes mean different things." Dkt. 36 p.8 (quoting <u>Yates</u>, 135 S. Ct. at 1082). The Magistrate Court, however, made the very mistake that <u>Yates</u> cautioned against. <u>See</u> <u>Yates</u>, 135 S. Ct. at 1082 (noting that "identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute" and string-citing numerous examples of such). Rather than looking to laws that bear any meaningful relation to § 1960, the Magistrate Court erroneously sought contextual guidance from the bankruptcy code, the judicial code, and other misplaced sources.

First, the Magistrate Court faulted the "line of Southern District cases" for what it called was their "first and exclusive resort to a dictionary" definition of "funds." Dkt. 36 p.14. According to the Magistrate Court, the Supreme Court had already defined "funds" as follows: "'The ordinary meaning of 'fund[s]' is 'sum[s] of money . . . set aside for a specific purpose.'' *Clark v. Rameker*, ___ U.S. ___, 134 S. Ct. 2242, 2246 (2014) (ellipsis and brackets in original) (citation omitted)." <u>Id.</u> at p.8 (reproduced as in Report and Recommendation). The Magistrate Court, however, failed to acknowledge that the context for this definition is not any criminal or regulatory anti-money laundering scheme, but bankruptcy law:

> The Bankruptcy Code does not define "retirement funds," so we give the term its ordinary meaning. See *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. ——, ——, 134 S. Ct. 1749, 1755-56 (2014). The ordinary meaning of "fund[s]" is "sum[s] of money ... set aside for a specific purpose." American Heritage Dictionary 712 (4th ed. 2000). And "retirement" means "[w]ithdrawal

15

from one's occupation, business, or office." *Id.,* at 1489. Section 522(b)(3)(C)'s reference to "retirement funds" is therefore properly understood to mean sums of money set aside for the day an individual stops working.

<u>Clark</u>, 134 S. Ct. at 2246.


In quoting <u>Clark</u> without analyzing its reasoning, the Magistrate Court missed the context that led the <u>Clark</u> court to choose its particular definition of "funds." The American Heritage Dictionary (4th ed. 2000) lists multiple definitions of "fund" and "funds." One of those definitions is "[t]he stock of the British permanent national debt, considered as public securities." <u>Id.</u> at 712. Clearly, such a definition is inapplicable to <u>Clark</u> (and to § 1960). Instead, the <u>Clark</u> court used the definition of "fund" as "[a] sum of money or other resources set aside for a specific purpose," for which the dictionary example of usage is "a pension fund." American Heritage Dictionary 712. Although "funds" may sometimes be more than simply the plural form of the singular "fund,"[5] the term "fund" as used in "pension fund" would be expected to have the same definition when used in "retirement funds." Thus, the <u>Clark</u> court chose the right definition in interpreting the Bankruptcy Code.


For that very reason, however, the <u>Clark</u> court's definition of "funds" in "retirement funds" is no precedent for the definition of "funds" in § 1960. Section 1960 refers to the transferring of "funds," not pension funds, and not retirement funds. <u>See</u> § 1960(b)(2); <u>see</u>

---

[5] The same dictionary has a specific definition for "funds" as "available money; ready cash," American Heritage Dictionary 712, recognizing that, depending on context, "funds" is not the same as "fund[s]." <u>See</u> 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise: words importing the singular include and apply to several persons, parties, or things; [and] words importing the plural include the singular.").

also Murgio, 2016 WL 5107128, at *4 (distinguishing between "funds" as used in § 1960, which "clearly refers to the money or liquid assets themselves," and "the kind of 'fund' that is comprised of a sum of assets").  By defining "funds" in an unrelated context, the Clark court's definition binds neither the Faiella, Budovsky, and Murgio courts, nor this Court.[6]

The Magistrate Court similarly erred in defining "money" synonymously with "government-issued 'dollars' or instruments, like checks, money orders, credit cards, or notes, directly connected to dollars" based on its reading of an array of other laws.  See Dkt. 36 pp.9-10.  In invoking the Clark definition of "funds" as "sums of money set aside for a specific purpose," the Magistrate Court introduced the also-undefined term "money."  Rather than consulting the same dictionary for its definition of "money," however, the Magistrate Court simply decreed its own definition of "money."  What the Magistrate Court missed is that the primary definition of "money," according to the same American Heritage Dictionary that defined "funds," is "[a] medium that can be exchanged for goods and services and is used as a measure of their values on the market, including among its forms a commodity such as gold, an officially issued coin or note, or a deposit in a checking account or other readily liquifiable [sic] account."  American Heritage Dictionary 1135.  Thus, neither "funds" nor "money" constrains § 1960 to government-issued currency and instruments.

---

[6]    The Report and Recommendation also claims that "[t]he civil forfeiture statute, 18 U.S.C. § 981, treats the term 'funds' as something that, inter alia, can be deposited in established and regulated financial institutions."  Dkt. 36 p.8.  To the extent that the Magistrate Court implies that being deposited is a necessary and not merely a sufficient characteristic of "funds" as used in § 981, that is simply a misreading of that statute.  The pertinent language from § 981 starts as, "if funds are deposited into an account at a foreign financial institution . . ." § 981(k)(1)(A).  The natural reading of this conditional statement does not limit "funds" to something that must have the capacity for being so deposited.

The Magistrate Court would have recognized such had it not ignored the statute that is sufficiently related to § 1960 to provide appropriate context. 18 U.S.C. § 1956 is as closely related to § 1960 in substance as any other criminal statute. Entitled "laundering of monetary instruments" and commonly referred to as "money laundering," § 1956 defines "monetary instruments" as any "(i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery." § 1956(c)(5).

The money laundering statute, however, criminalizes more than conduct involving monetary instruments. Section 1956(a)(1) prohibits certain financial transactions involving proceeds of specified unlawful activity, for which "financial transaction" is defined to include "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments. . ." § 1956(c)(4) (emphasis added). Furthermore, the statute prohibits certain international transfers of "a monetary instrument or funds." § 1956(a)(2) (emphasis added). Although Congress likewise did not define "funds" in § 1956, clearly, it intended for "funds" to be different from "monetary instruments." See Muscarello, 524 U.S. at 136 (courts assume that Congress intends each term in a statute to have a "particular, nonsuperfluous meaning"). To read otherwise would be to read substantial portions of the statute into duplicity or oblivion. Thus, even if "money" were limited to government-issued currency and related instruments as per the Magistrate Court, the term "funds" is not so constrained. See, e.g.,

United States v. Day, 700 F.3d 713, 725-26 (4th Cir. 2012) (affirming money laundering conviction in interpreting "funds" to cover physical sets of gold).

The same holds for the companion statute to § 1956 in 18 U.S.C. § 1957. Entitled "engaging in monetary transactions in property derived from specified unlawful activity," that statute defines "monetary transaction" to include the transfer, "in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5) of this title) by, through or to a financial institution (as defined in section 1956 of this title). . ." § 1957(f)(1) (emphasis added). To conflate "funds" with "monetary instrument" as the Magistrate Court recommends would again impermissibly read statutory text as surplusage.

## 2. The Magistrate Court misconstrued the purpose of and legislative history behind § 1960 in narrowly defining its scope.

The history of § 1960 makes clear that Congress intended it to apply far more broadly than the Magistrate Court acknowledges. The Report and Recommendation posits that "[c]riminal monetary statutes exist in part to protect a uniform, regulated monetary system; that is, they aim to prevent any implicit lending of sovereign power or legitimacy to criminal enterprises." Dkt. 36 p.11 (emphasis added). The Report and Recommendation, however, is fatally silent as to any other purpose. Full analysis of the purpose of § 1960 shows that the Magistrate Court's fixation on "the involvement of a sovereign" (Dkt. 36 p.9) was in error.

As recited supra at p.5, § 1960 and related statutes were amended by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, in part to address "informal banking systems, like the ancient South Asian money exchange system called

hawala. . . [which] are exploited by terrorists and other financial criminals because of the lack of record-keeping and opportunity for anonymity."  H.R. Rep. No. 107-250, at 34.  The Second Circuit has explained the operation of a hawala as follows:

> The hawala system is widely used in Middle Eastern and South Asian countries, and is primarily used to make international funds transfers.  Though there are many forms of hawala, in the paradigmatic hawala system, funds are transferred from one country to another through a network of hawala brokers (i.e., "hawaladars"), with one hawaladar located in the transferor's country and one in the transferee's country. In this form, a hawala works as follows: If Person A in Country A wants to send $1,000 to Person B in Country B, Person A contacts Hawaladar A in Country A and pays him $1,000. Hawaladar A then contacts Hawaladar B in Country B and asks Hawaladar B to pay $1,000 in Country B currency, minus any fees, to Person B. The effect of this transaction is that Person A has remitted $1,000 (minus any fees) to Person B, although no money has actually crossed the border between Country A and Country B.

> Eventually, Hawaladar B may need to send money to Country A on behalf of a customer in Country B; he will then contact Hawaladar A, with whom he now has a credit due to the previous transaction. Hawaladar A will remit the money in Country A to the designated person there, thus clearing the debt between the two hawaladars. Typically, Hawaladar A and Hawaladar B would engage in many parallel transactions moving in both directions. A number of transactions might be required before the books are balanced between the two hawaladars. If after some period of time their ledgers remain imbalanced, the hawaladars may "settle" via wire transfer or another, more formal method of money transmission. The hawala system operates in large part on trust, since, as in the example above, a hawaladar will remit money well before he receives full payment, and he does so without the benefit of a more formal legal structure to protect his investment.

United States v. Banki, 685 F.3d 99, 103 (2d Cir. 2012).  One advantage of the hawala system, as noted in the House report, is the potential to anonymize the true sender and recipient of the funds being transferred.  See, e.g., United States v. Elfgeeh, 515 F.3d 100, 108-09 (2d Cir. 2008).  In enacting the Act, Congress sought to erase any doubt "that informal value transfer banking systems like hawalas are . . . covered by references to money transmitting businesses in certain provisions of existing law."  H.R. Rep. No. 107-250, at 63-64.

Bitcoin is simply an evolved version of the above-described hawala. Bitcoin's implementation is different in that it has a single, integrated ledger that needs not rely on trust between the operators to function. For the customers, however, it provides nearly identical results. In an analogous transaction to the <u>Banki</u> example, Person A goes to Exchanger A, instead of Hawalader A. Person A pays a quantity of currency to Exchanger A for Exchanger A to transfer the value of the currency as bitcoins to a Bitcoin address controlled by Person B (or to a Bitcoin address controlled by Person A for Person A to in turn transfer to an address controlled by Person B). When Person B receives the transfer, Person B pays Exchanger B to receive the value of the bitcoins in whatever currency Person B wants. Under § 1960, funds have been transferred from Person A to Person B, just as in a hawala.

The Magistrate Court's fixation on what "ordinary people" may think of "any private medium of exchange" is not only beyond its powers to divine so, but irrelevant to a proper analysis of § 1960. "Ordinary people" in the abstract context envisioned by the Magistrate Court may not use hawalas to receive salaries, deposit savings, or pay bills. <u>See</u> Dkt. 36 pp.12-13. That does not matter. The text and the history of the Act make clear that it covers informal value transfer systems, such as hawalas, that operate outside traditional financial institutions. Bitcoin is no different.

Looking to such context does not cause this reading of § 1960 to violate the rule of lenity. "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." <u>Callanan v. United States</u>, 364 U.S. 587, 596 n.9 (1961) (quoting <u>Bell v. United States</u>, 349 U.S. 81, 83 (1955)).

"The simple existence of some statutory ambiguity [however,] . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." Muscarello, 524 U.S. at 138 (internal quotation omitted). "Because the meaning of language is inherently contextual, [courts] have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was possible to articulate a construction more narrow than that urged by the Government." Moskal, 498 U.S. at 108 (emphasis in original). Rather, the rule "applies only if, 'after considering text, structure, history and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended.'" Abramski, 134 S. Ct. at 2272 n.10 (internal quotation omitted); Callanan, 364 U.S. at 596 ("The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers."). Where "the text creates some ambiguity, [but] the context, structure, history, and purpose resolve it," the rule of lenity does not apply. Abramski, 134 S. Ct. at 2272 n.10.

<u>CERTIFICATION</u>

Pursuant to Local Rule 59(c)(3), the government certifies that this objection raises no new arguments, except in response to authorities cited for the first time by the Magistrate Court in the Report and Recommendation and to findings and conclusions drawn from those authorities.

<u>CONCLUSION</u>

For the foregoing reasons, this Court should reject the Report and Recommendation

(Dkt. 36) and deny the defendant's motion (Dkt. 23) to dismiss Count Two of the Superseding

Indictment (Dkt. 16).


DATED:  Buffalo, New York, December 14, 2016.


                              JAMES P. KENNEDY, JR.
                              Acting United States Attorney


                    By:      s/WEI XIANG
                              Assistant United States Attorney
                              United States Attorney's Office
                              Western District of New York
                              138 Delaware Avenue
                              Buffalo, NY  14202
                              716/843-5806
                              Wei.Xiang@usdoj.gov