UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA ) 15CR227
)
vs.
Buffalo, New York
RICHARD PETIX, ) August 24, 2016
Defendant. 10:15 a.m.
- - - - - - - - - - - - - - - - - - - X

**Motion**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

WILLIAM J. HOCHUL, JR., ESQ.
United States Attorney
BY: WEI XIANG, ESQ.
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York 14202

STEPHEN M. LEONARDO, ESQ.
Cerulli, Massare & Lembke
45 Exchange Boulevard, Suite 925
Rochester, New York 14614
Appearing on behalf of the Defendant

COURT REPORTER: Karen J. Bush, Official Court Reporter
(585) 613-4312
100 State Street
Rochester, New York 14614

USA VS. R. PETIX

P R O C E E D I N G S

*  *  *

THE CLERK: 15CR227, United States versus Richard Petix. Oral argument. Counsel, please state your name and the parties you represent for the record.

MR. XIANG: Good morning, your Honor. Wie Xiang for the government.

MR. LEONARDO: Good morning, your Honor. Steve Leonardo for the defendant, Richard Petix.

THE COURT: Good morning. Today is the return date for oral argument. Do you wish to be heard?

MR. LEONARDO: Judge, I do. And may it please the Court, I think the government's response to the supplemental motion that the defendant filed illustrates the point that the defendant argues as it relates to what had to be some -- I will use the word impropriety, but I don't use it in a sinister sense. I think the evidence that was presented to the grand jury could not have been proper or appropriate to support the indictment because, as the government seems to concede, the conduct of Mr. Petix was simply the sale of Bitcoin. And they ascribe some sinister context to that. But to better understand what the defendant argues here, you can exchange

Bitcoin for silver dollars, nothing prevents any of us from selling silver dollars. And here, Mr. Petix sold Bitcoin. He wasn't engaged in the business of collecting money from person A and simply transmitting that money to person C. What he did was sold Bitcoin, in this case, from person A and collected the money for himself. There is no crime in that. And to have obtained an indictment on the basis of that had to be based on information or evidence that was inappropriate. Short of that, your Honor, the defendant in the initial motion that he filed, asked for suppression of certain, in addition to discovery, which the government has continued to provide, the defendant has asked for suppression of certain statements and tangible evidence that was taken from him. Thank you.

THE COURT: Does the government take the position that there was some benefit, other than personal, to him? In other words, as he is out there in this market, whatever it is, virtual market, his sale is not for someone else's benefit, but his own? Do you understand what I'm concerned about a little bit here?

MR. XIANG: Not quite, your Honor.

THE COURT: Okay. I think, let me just see where that comes from. Hold on. The language in 1960(b)(2), "on behalf of the public," what does that mean?

MR. XIANG: That is referring to the transmittal,

your Honor. And it's referring to the customer base, if you will. What (b)(2), transferring funds on behalf of the public, there is something that is existential about the Bitcoins that --

THE COURT: Let's look at Western Union.

MR. XIANG: Right. So the customer comes and gives funds in the form of whatever currency to Western Union to be transmitted to another person or a location. "On behalf of the public" refers to the customer. Western Union is taking a fee and is gaining a benefit for itself for providing this service. This isn't a charity.

THE COURT: That seems to be a triangle.

MR. XIANG: Well --

THE COURT: Western Union, an individual who is cashing it in and one --

MR. XIANG: Right.

THE COURT: That is three.

MR. XIANG: Well, yes, there is, but it appears to be three, but there may only be two. What it does is it's a different form. There is nothing preventing, for example, Western Union does not know who the receiver on the other end is. It could be the same person who gave Western Union the money on the front end.

THE COURT: Then wiring yourself money.

MR. XIANG: Right. That is where the statute provides for and the case law that's to a different person or location. It could be the same controller of the currency. The funds never left the control or weren't intended to go to a third party, it's to the same person at a different location. That is exactly -- that is a change in form, that is not a change in ownership. That is exactly the situation with the service that Mr. Petix provided on behalf of the public. And it is the public, because anybody -- he advertised publically, anybody could get his services simply by paying him for those services. There were people, we cited 81 deposits, cash deposits, from 11 different states. We have the text messages, we have an e-mail history showing these came from different sources, people soliciting his business, people who made use of his services. What he did was -- and we'll take the example of someone who does it both in cash in person and a remote customer. If you have -- so, cash in person, you meet him, you give him the cash and then you give him a Bitcoin address. He transfers the funds. He converts the funds, if you will, from the form of the physical currency into the electronic, the digital currency form, the Bitcoin, and transfers the value of the funds he received to some Bitcoin address provided by the customer. That Bitcoin address, whether it is controlled by the customer or whether the customer is using Mr. Petix's

services to pay someone else, for example, a vendor, or there is no indication, it doesn't matter. It doesn't matter to him, just like it doesn't matter to Western Union. What he is doing is converting it into a different form and putting them at a different location. It may be to a different person or it may not be. But there is no difference in what he did for them versus what the Court has brought up, Western Union, because we can't make assumptions about who is controlling where it's going.

As far what's being brought up about what's the difference between Bitcoins and a silver dollar and a dime and gold jewelry and so forth, well, we have to look at how the stuff is used, that is going to depend on the context. And I brought up by way of example and these are not theoretical examples of markets, market places that only use as their medium of exchange Bitcoins. We don't have one that uses diamonds or, I mean, things that have intrinsic value of themselves. Sort of like paper cash, other than the ink that is printed on it, there is really no difference between one bill and another, but you treat them differently because, well, a legal tender, that is a different, but in terms of the intrinsic value of the paper and the ink, it's almost worthless. And Bitcoins are just, you know, bits, zero and ones stored on some server. They are worthless if people

didn't have a use for them. And there are markets. They may not be the ones that, you know, the Court may see on a day-to-day basis, but the Court also doesn't see, we also don't see Swiss banks being used in the stores on the streets of Buffalo. But it doesn't mean there is a place, there is a forum where the sole or preferred method of payment is through this medium of exchange, that is some form of virtual currency and Bitcoins is the one that is used. I cited the examples of the actual customers, customers of his who took the funds that he converted for them, that he transmitted for them into a form that they are, then able to use to render payment for the goods and services. That is what a money transmitter does. He made the funds available to them for use on a forum that they wouldn't have been able to do without his services.

THE COURT: All right. So we're clear, it's currency.

MR. XIANG: It's --

THE COURT: Metaphysical.

MR. XIANG: The term "currency" is not defined. I would prefer to use the term "funds" because under 1960, you know, 1960 and 1956, the money laundering statute, and 31 U.S.C. 5330, which is the Bank Secrecy Act statutes, they all use some form of currency or funds and they all potentially use it in different ways. And the statutes, the case law has

cautioned us not to import definitions that on their face are limited to a particular section to another. So since 1960 refers to the transmittal of funds, I would prefer to stick to "funds."

THE COURT: Use "funds," okay.

MR. XIANG: And, Judge, if I may address what the defense brought up regarding their initial motion. And as they brought up, we also provided -- the initial motion they filed, which is docket 15, back in February of 2016 addressed certain things and that was before the return of the superseding indictment. And yes, we provided -- actually, after the superseding indictment, there was a lot more stuff that became relevant and we provided substantial amounts of that to them. There was an issue I thought of, whether or not this initial motion on the initial indictment is still good or active or pending, if you will, before the Court, and I didn't respond to it because it didn't seem to me that it was. It wasn't renewed and there are portions of it that would seem to make no sense in terms of that they applied only to Count 1.

THE COURT: Theoretically new indictment, new motions. But you can agree that that motion pertains to the superseding indictment and we can move from there.

MR. LEONARDO: Well, Judge.

MR. XIANG: The problem, Judge, for example the

Bill of Particulars section, it doesn't say with respect to the indictment, it specifically recounts only Count 1. It doesn't -- I mean, there was no Count 2, but, you know, I can't make the assumption that they did or did not intend to also file a Bill of Particulars with respect to Count 2 if they could re-file.

THE COURT: Clarify.

MR. LEONARDO: Judge, as indicated in the very caption, the second motion is entitled or captioned "supplemental motion," it's supplemented.

THE COURT: These were the first motions ever made.

MR. LEONARDO: Correct.

MR. XIANG: If the first motion remains pending on its face, Judge, then what they're saying is they don't seek a Bill of Particulars with respect to Count 2.

MR. LEONARDO: We did not.

THE COURT: Okay. That tells me.

MR. XIANG: Okay.

THE COURT: All right. Brief response if you have one.

MR. LEONARDO: I do. Again, it's an attempt by the government to ascribe some sinister motive to the sale of Bitcoin. Your Honor is, I'm sure, familiar with Ebay or

Craigslist or even a baseball card. If my client was able to find somebody that was willing to buy a baseball card he owned for a certain sum of money and sold it, that's not money laundering. There is no -- there is no act or allegation here or in that context that he tried in someway to disguise what he did. He sold a baseball card to somebody who wanted to buy that baseball card. As the government concedes, during the time frame in question, and he didn't create the Bitcoin market, he didn't create the Bitcoin marketplace, he didn't dictate the price of Bitcoin. What happened, as the government alleges in their responsive papers, during the time frame in question, the price of Bitcoins on the open market went from $200 to $600. Something that Mr. Petix was able to take advantage of as he sold his Bitcoin or his baseball card. That is not a crime. That is what I believe the evidence before the grand jury had to be.

THE COURT: All right.

MR. XIANG: Judge, there is an issue with what they just brought up. And again, another assumption they make about how Mr. Petix made his money or what the proof was about this 200 to $600 issue. First of all, fluctuating conversion rates is nothing new. You know, the Euro fluctuates as to what it's worth in U.S. dollars. How he obtained his Bitcoins is something that is not known to us. At what price he may have

purchased it is not known to us. Whether he made money in terms of the Bitcoin increasing or decreasing in value is not known. There were six flash drives that were encrypted, what they contained, we don't know. But what we do know is he wants to -- he is defying and continuing to defy Judge Siragusa's supervised release order in disclosing the contents of those flash drives to his probation officer. The defendant is not charged with money laundering or under 1960(b)(1)(C). (B)(1)9C) is otherwise involves the transport or transmission of funds that are known or known to the defendant to be derived from a criminal offense or intended to promote or support a criminal offense. So that say different, that is more of a money laundering-type activity. He is only charged with what is more a regulatory offense, and the defense didn't bring this up in the papers, but what they have alluded to now is also sort of that he didn't know, he wouldn't have known what he was doing was bad. Among the text messages that I provided to them that he exchanged with one of his counter parties, he makes a mention of anything over $2999 is bad or is, you know, sort of --

THE COURT: Dangerous.

MR. XIANG: Yeah. Well, that number, of all numbers, has bases in the Bank Secrecy Act anti money laundering regulations. $3,000 is a reporting threshold when

it comes to currency exchange. So, there is more than -- and on the basis of their three sentence motion and all of the assumptions and guesses as to what went on in the grand jury, that is simply no bases to provide the Court with something to even look at to adjudicate their motion on the merits.

THE COURT: I'm going to reserve decision.

MR. LEONARDO: Thank you, your Honor.

THE COURT: It should be -- you'll get a decision from me quickly on this. This case is aging. Yeah, we're going to -- it will be really quick.

MR. LEONARDO: Thank you.

THE COURT: Thank you. Have a good day. Motions are still pending. Time is excluded until those motions are resolved.

MR. XIANG: As to the initial motion?

THE COURT: As to this motion and the prior motion because it is still viable.

MR. XIANG: Okay.

THE COURT: It's unresolved and it does pertain now to the superseding indictment.

MR. XIANG: All right.

THE COURT: By their admission.

MR. XIANG: Okay. So since they've done it, Judge, if I may have the opportunity to go through. If there

is any -- again, it strikes me as somewhat odd, but they're seeking a Bill of Particulars only as to Count 1 not as to Count 2.

THE COURT: That is what they've said.

MR. XIANG: If that is what they've said, if I may have a week to file any response to the --

THE COURT: Of course. What's today? Today is the 24th, by the 31st.

MR. LEONARDO: Thank you, your Honor.

THE COURT: All right.

MR. XIANG: Yes, Judge.

THE COURT: And at that point, I'll consider everything submitted.

MR. XIANG: Yes, your Honor.

THE COURT: Enough.

MR. LEONARDO: Thank you, Judge.

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s Karen J. Bush, RPR

Official Court Reporter