IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        v.                                       15-CR-227-CJS

RICHARD PETIX,

        Defendant.
_____

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S OBJECTIONS TO PSR

THE UNITED STATES OF AMERICA, by and through its attorneys, James P. Kennedy, Jr., Acting United States Attorney for the Western District of New York, Wei Xiang, Assistant United States Attorney, of counsel, hereby files its response to the defendant's objections (Dkt. 82) to the Presentence Investigation Report (Dkt. 72).

The PSR correctly calculates the defendant's base offense level for Count 2 as 16 and correctly assesses the two-level enhancement under Guidelines § 2S1.3(b)(1), for an adjusted (and combined adjusted) offense level of 18. Even if the Court agrees with the defendant in finding the adjusted offense level for Count 2 to be 14, the combined adjusted offense level should then be 15, not 14 as the defendant erroneously calculates.

    1.     <u>Base Offense Level for Count 2</u>

Under Guidelines § 2S1.3(a)(2), the base offense level for Count 2 (Operating an Unlicensed Money Transmitting Business under 18 U.S.C. § 1960(b)(1)(B)) is 6 plus the

number of offense levels from the table at § 2B1.1(b)(1) corresponding to the value of the funds involved in the offense conduct. The PSR aggregated the transactions from the defendant's bank receipts ($102,796.96), CD-1 ($56,360.00), CD-2 ($5,581.00), and CS-1 ($25,125) to reach $189,862.96. PSR ¶¶ 37-41. Although this figure undercounts the defendant's conduct by approximately $13,320 (the value of the 37 bitcoins that he transferred for the undercover agent, PSR ¶ 24), the difference is immaterial as both $189,862.96 and $203,182.96 exceed $150,000, but not $250,000.[1] Based on § 2B1.1(b)(1)(F) (adding 10 levels), the defendant's base offense level is 16. PSR ¶ 53.

The defendant claims that all of the $87,066 in funds from CD-1, CD-2, and CS-1 are included in the $102,796.96 in bank receipts. Dkt. 82 p.8. The defendant's only supporting basis is his attorney's conclusory allegation that "based upon our analysis of the bank records we have received, it is our conclusion and belief that" the funds from CD-1, CD-2, and CS-1 were deposited into the defendant's Bank of America account. Id. The Court should reject this baseless allegation without evidentiary support.

The government's submission regarding forfeiture (Dkt. 73) illustrates why the $87,066 in funds from CD-1, CD-2, and CS-1 do not overlap with the $102,796.96 in bank receipts. Exhibit 3 of Special Agent Brad Brechler's supporting affidavit (Dkt. 73-1) lists all of the Bank of America receipts that aggregate to $102,796.96. These receipts fall into two

---

[1] The government sought forfeiture (Dkt. 73) of only $189,862.96, without including the UCA transaction, because the defendant transferred those bitcoins before receiving the funds from the undercover agent. To seek additional forfeiture of the $13,320 would be double-counting. But the volume of the defendant's business should still include those 37 bitcoins and be considered as at least approximately $203,182.96.

categories: cash deposits and electronic transfers. The cash deposits, whether by counter credit or ATM, were almost all from out-of-state. The only four New York State deposits were in Brooklyn or Manhattan, far outside the Western District of New York. Yet all of the transactions with CD-1, CD-2, and CS-1 were in-person meets in this District. And all participants (the defendant, CD-1, CD-2, and CS-1) resided in this District. Thus, there is no reason to believe that any of these cash deposits overlaps with CD-1, CD-2, or CS-1.

As for the electronic transfers, the only way that any would overlap with cash from CD-1, CD-2, or CS-1 is if the defendant deposited the cash into other accounts under his control, then transferred those funds into his or his girlfriend's Bank of America accounts. This roundabout method of transferring the funds makes no sense, nor is there any evidence of the defendant doing so. To the contrary, the full Bank of America records show cash deposits in the Rochester area, which means that the defendant could have directly deposited cash from CD-1, CD-2, and CS-1 into his accounts if he wished, without depositing them into other accounts for electronic transfer into the Bank of America accounts. (Precisely to avoid such double-counting, no Buffalo or Rochester-area cash deposits are counted in the $102,796.96 bank total.)

Furthermore, the timing and amounts of the cash transactions do not match the timing and amounts of the electronic transfers. Exhibits 4, 5, and 6 of SA Brechler's affidavit (Dkt. 73-1) list all of the transactions with CD-1, CD-2, and CS-1, respectively. Take, for example, CD-1's first three transactions with the defendant. They occurred in August and September of 2014 and totaled approximately $10,000. See Dkt. 73-1, Ex. 4.

The list of Bank of America transactions, however, shows only three electronic transfers in 2014, all in November, totaling less than $2,000. See id. at Ex. 3. There is no reason to believe that the defendant held onto CD-1's $10,000 cash for months before depositing less than $2,000 of it into other parties' accounts to transfer into the Bank of America accounts.

Lastly, if all of the transactions with CD-1, CD-2, and CS-1 (totaling $87,066) were subsumed in the $102,796.96 of bank receipts, that would leave the defendant only $15,730.96 of remote transactions in 16 months of business. Such a relatively low proportion of remote transactions is inconsistent with the evidence in this case. The defendant had no transactions with CD-1, CD-2, or CS-1 in the four months between February 20 and June 16, 2015. See Dkt 73-1, Exs. 4-6. Yet when the defendant solicited CD-1 on June 16, 2015, the defendant said, "The bank deposit option is just so convenient lol. I need to get away from it though. I was wondering if you are looking to buy some btc?" Id. at p.9. Consistent with the defendant's proclaimed reliance on bank deposit, he received over $36,000 across 30 transfers during the four-month period. Id. at Ex. 3. This shows that the defendant had enough business via bank deposit to not need cash meets. Therefore, the PSR correctly concludes, by a preponderance of the evidence, that none of the CD-1, CD-2, and CS-1 cash transactions duplicates any of the bank transactions and that the defendant's total volume exceeded $150,000, resulting in a base offense level of 16.

2. Specific Offense Characteristic for Count 2

Under Guidelines § 2S1.3(b)(1)(A), a two-level enhancement applies if the defendant knew or believed that the funds involved in his offense conduct were (i) proceeds of

unlawful activity or (ii) intended to promote unlawful activity. This includes both funds that were received from customers being proceeds of the customers' unlawful activity and funds that were transferred for the customers as being intended to promote unlawful activity. Taking into account the transactions with CD-2, who used his bitcoins to buy over $100,000 of marijuana on dark net markets, and the defendant's lies relating to his offense conduct, PSR ¶ 54 assesses the enhancement. The defendant objects, arguing that the PSR draws an impermissible inference about his knowledge. Dkt. 82 p.8.

The inference is proper. Circumstantial evidence may support a conclusion regarding a defendant's knowledge or belief of the funds involved in his offense conduct. See United States v. Suarez, 225 F.3d 777 (7th Cir. 2000) (affirming enhancement under § 2S1.3(b)(1) for bulk cash smuggling where defendant's "duplicity, combined with her denial of the existence of the cash and her placement of the large sum of currency in her checked luggage packaged so as to avoid detection, supports the district court's conclusion that the money was more likely than not related to unlawful activity"); cf. United States v. Finkelstein, 229 F.3d 90, 96-97 (2d Cir. 2000) (for money laundering sentence under § 2S1.1(b)(1), inferring from totality of circumstances that defendant knew he dealt with proceeds of drug trafficking and not some other unlawful activity); United States v. Berrio, 77 F.3d 206, 208-10 (7th Cir. 1996) (same); United States v. Carr, 25 F.3d 1194, 1209-10 (3d Cir. 1994) (same). The Berrio court noted: "The beeper calls, the arranged meetings, the cash in small denominations, the wrappings, and the destination being the cocaine capitol of the world [Colombia] all emit the aroma of drug dealing. One would have had to be born yesterday . . . to not see what was going on here." Berrio, 77 F.3d at 209-10.

Similarly, the defendant was not born yesterday into the world of Internet-based criminal activity. His prior conviction before this Court shows that he was an active participant in that arena a decade earlier, in 2005. In his offense conduct here, he used the anonymizing tools of the trade[2], he transacted for customers who used their (his) bitcoins on dark net markets for contraband[3], he hid his activities from this Court, and he lied to Probation when caught during the undercover operation. An inference of his knowledge that the funds came from or were going to unlawful activity is appropriate from these circumstances alone.

Furthermore, the defendant's actual knowledge of unlawful activity is reinforced by evidence of his dealings with CD-1. On September 7, 2015, CD-1 sent a message to the defendant which read, "I stopped selling coin [to] the public because I didn't want any trouble from the state / irs. I wouldnt risk it with NYS." Despite knowing that his customer's bitcoin activity entailed trouble with state and federal authorities, the defendant

---

[2] The defendant objects to PSR ¶¶ 32-33, claiming that there is no evidence that he was accessing the dark net or using the TOR browser. Dkt. 82 pp.2-3. To the contrary, the evidence shows that the defendant knowingly used TOR in his unlicensed money transmitting business. In a text message on August 26, 2014, to CD-1 about technical means of circumventing New York State's BitLicense regulatory scheme, the defendant wrote: "it wouldn't be hard to setup a bitcoin wallet in tails so it automatically connects to tor and never goes through nys ; )". Dkt. 73-1 p.5 n.5. When he transferred the 37 bitcoins to the undercover agent on December 3, 2015, the defendant followed his own advice: he used a bitcoin wallet stored on a thumb drive using the TAILS operating system, thereby automatically connecting via TOR. Id. at p.5.

[3] The defendant also objects (Dkt. 82 pp. 1-7) to PSR ¶¶ 31-36, which generally describe the use of bitcoins in dark net markets, the need for money transmitting businesses to comply with anti-money laundering regulations, and the investigation of the defendant for selling bitcoins to an individual or individuals who were involved in the illegal drug trade. This background is appropriate context for both the defendant's own conduct and why these and related laws required the defendant's registration with FinCEN and compliance with applicable regulations.

conducted five more transactions totaling approximately $15,000 with CD-1. See Dkt. 73-1, Ex. 4. By at least a preponderance of the evidence, the defendant knew or believed that the funds involved in his offense conduct, whether with CD-1, CD-2, or another counterparty, were proceeds of or intended to promote unlawful activity. Thus, the PSR correctly assesses the two-level enhancement under Guidelines § 2S1.3(b)(1)(A) and calculates the adjusted offense level for Count 2 as 18.

### 3. Combined Adjusted Offense Level

For the above reasons, PSR ¶ 62 correctly calculates the combined adjusted offense level as 18, with total offense level as 16. Id. at ¶ 65. But even if the Court agrees with the defendant in finding the adjusted offense level for Count 2 to be 14, the combined adjusted offense level should then be 15, not 14 as the defendant erroneously calculates (Dkt. 82 p.10). The defendant misapplies Guidelines § 3D1.4. Under § 3D1.4(a), Count 2 would be one Unit at offense level 14. Under § 3D1.4(b), Count 1 would be one-half Unit at offense level 6. The total number of units would then be 1.5, not 1, resulting in a 1-level increase in the highest offense level from 14 to 15. Thus, even if the Court agrees with the defendant in finding the adjusted offense level for Count 2 to be 14, the total offense level would be 13, not 12 as the defendant miscalculates (Dkt. 82 p.10), and the guideline imprisonment range would be 18 to 24 months, not 15 to 21 months.

### 4. Offender Characteristics

The defendant objects to PSR ¶¶ 91-104, which include a recitation of his "mental and emotional health" history of evaluation and treatment from his prior case. Whether or

not they constitute "history and characteristics of the defendant" that shall be considered by the Court for sentencing under 18 U.S.C. § 3553(a), the government takes no position on their inclusion.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's objections on Count 2 and adopt the calculations in the PSR finding his total offense to be 16 and guideline imprisonment range to be 27 to 33 months.

DATED: Buffalo, New York, July 30, 2017.

        JAMES P. KENNEDY, JR.
        Acting United States Attorney

By:    s/WEI XIANG
        Assistant United States Attorney
        United States Attorney's Office
        Western District of New York
        138 Delaware Avenue
        Buffalo, NY 14202
        716/843-5806
        Wei.Xiang@usdoj.gov