**U.S. Department of Justice**

United States Attorney
*Western District of New York*

*100 State Street*
*Rochester, New York 14614*

*(585) 263-6760*
*fax (585) 399-3920*

***Writer's Direct Dial: (585) 399-3954***
***Grace.Carducci@usdoj.gov***

October 13, 2017

Hon. Charles J. Siragusa
Senior United States District Judge
100 State Street
Rochester, New York 14614

**Re: U.S. v. Petix**
15-CR-0227 CJS

Dear Judge Siragusa,

Pursuant to the Court's directive to file a letter brief addressing certain issues concerning the defendant's upcoming sentencing, the United States sets forth the following:

**I. <u>The Defendant's Failure to Object to the Forfeiture Determination should not Preclude him from Arguing the Offense Conduct Figures:</u>**

The government does not object to the defendant raising issues to his offense conduct monetary figures contained in the PSR, based on his failure to object to the property involved in the unlicensed money transmitting business for forfeiture purposes. Forfeiture money judgments and relevant offense conduct are measured differently and there could be a variety of reasons as to why the defendant waived any objection to the calculation of $189,862.96 as property that was involved in the 1960 offense.[1] In any event, our research in this area only

[1] Due to the fact that the defendant did not enter into a plea agreement agreeing to the forfeiture, in accordance with Fed.R.Crim. P 32.2, the government submitted a Motion for a Preliminary Order of Forfeiture to The Court. This motion was the proper vehicle allowing the Court to make a determination regarding the amount involved in the defendant's unlicensed money transmitting business. *See United States v. McIntosh*, No. 11-CR-500 (SHS), 2017 WL 3396429, at *8 (S.D.N.Y. Aug. 8, 2017). Federal Rule of Criminal Procedure 32.2 prescribes a detailed timeline for the imposition of a sentence of criminal forfeiture. Once the government provides notice in the indictment of its intent to seek forfeiture pursuant to Rule 32.2(a), the Court must determine what property is forfeitable "[a]s soon as practical after a verdict," *id.* 32.2(b)(1)(A), and "promptly" enter

uncovered one Second Circuit decision touching on the use of determining facts in a forfeiture proceeding be determinative in calculating the offense conduct level. However, under the Circuit rules, since that case is an Appendix decision predating January 1, 2007, we cannot cite it as precedential value.[2.] In any event, the relevant offense conduct for the reasons discussed below, should be calculated at $203,182.96.

## II. <u>Petix was a Bitcoin Exchanger and was Operating an Unlicensed Money Transmitting Business:</u>

First and foremost, the Court must sentence the defendant based upon his plea of guilty to the Indictment. The defendant admitted to the violation in Count 1 (false statements) and Count 2 (prohibition of unlicensed money transmitting businesses). Defendant pled guilty to knowingly conducting, controlling, managing, supervising, directing and owning all or part of an unlicensed money transmitting business and failing to register such business with the applicable federal regulatory agency, in this case FinCEN. Just as important for the purposes of this sentencing proceeding, the defendant by his guilty plea admitted he engaged in this conduct ***beginning in or prior to August of 2014 and continuing until December 3, 2015.***

18 U.S.C. § 1960(b)(1) defines an "unlicensed money transmitting business" as a money transmitting business which affects interstate or foreign commerce in any manner or degree and which satisfies one of three additional requirements (only one of which involves a license). The applicable requirement in this case is found in § 1960(b)(1)(B), that the business failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 or regulations prescribed thereunder.

18 U.S.C. §1960 does not define "business," but defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." <u>See</u> § 1960(b)(2).

---

a preliminary order of forfeiture for that property, *id.* 32.2(b)(2)(A).

2 See *United States v. Nall,* 78 Fed. Appx. 158, 159 (2d Cir. 2003). "The District Court's relevant conduct finding rested primarily on testimony offered at a related forfeiture hearing, including testimony by [a]cooperating co-defendant, to the effect that [the defendant] had claimed to have sold marijuana previously in lots as large as six and seven thousand pounds. [The defendant] does not dispute that this testimony, if accepted as true, would establish that the previous marijuana sales were part of the same "course of conduct" as the offense of conviction, and therefore was properly considered by the District Court. *See* U.S.S.G. § 1B1.3(a)(2)."

As referenced in § 1960(b)(1)(B), § 5330 governs the registration of money transmitting businesses with the Secretary of the Treasury. See § 5330(a)(1). Under 31 U.S.C.§ 5330 § 5330(d), a "money transmitting business" includes any "person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system," is required to file reports under section 5313, and is not a depository institution.

Applicable regulations prescribed under 31 U.S.C.§ 5330 are found at Title 31, Parts 1010 and 1022 of the Code of Federal Regulations. 31 C.F.R. § 1010.11(ff) and (ff)(5)(A) define a "money services business" to include a "person wherever located doing business, ***whether or not on a regular basis*** or as an organized or licensed business concern," who "provides money transmission services." (Emphasis added). Such services means "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." See § 1010.11(ff)(5)(A). Such money services businesses must register with FinCEN. See § 1022.380(a). Failure to register is criminally punishable under 18 U.S.C. § 1960. See § 1022.380(e).

The FinCEN guidance defendant has sought reliance upon does not support his position. The March 18, 2013 opinion provides a definition of both what is a user and what an exchanger of virtual currency is and concludes that users do not have to register as an MSB, while exchangers must. See Dkt # 89, Exhibit "A" pgs. 2-3.

***A user is defined as a person that obtains virtual currency to purchases goods or services. Such a person is not a Money Services Business and not required to register with FinCEN.***

Clearly, the defendant does not fall at all under the definition of a user. The guidance then defines what constitutes activity of an exchanger, as a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency. The guidance further states that an exchanger who: 1) accepts and transmits a convertible virtual currency, or 2) buys or sells convertible virtual currency ***for any reason*** is a money transmitter under the FinCEN regulations. (Emphasis added). This is exactly the type of activity that the defendant engaged in from August 2014 through December 3, 2015.

Nowhere in the statutory scheme or the regulations is there is a requirement that a fee be charged or involved in this transmission. The key terminology included in the definition of the Money Services Business ("MSBs"), is "any person doing business whether or not on a regular basis or as an organized business concern…" There are no caveats or requirements pertaining to face-to-face transactions, third-party involvement or fee collections. The integral part is doing business as one of the six (6) identified classes. See § 1010.11(ff)(1) through (7). The defendant is defined as a money transmitter as he is a person who engaged in a business involving the transfer of funds and qualifies as an MSB.

The defendant, by pleading guilty to the indictment, admitted to operating an illegal money transmitting business during the time period of August 2014 through December 2015. By this admission of guilt, Petix has admitted that he did not qualify as a user, but was an exchanger. Since he pled guilty to operating an unlawful money transmitting business, he cannot now change his tune for sentencing purposes and claim he was only a user (or what he terms an "investor"). As indicated in Special Agent Brechler's unopposed affidavit, $189,862.96 was the property involved in the defendant's unlicensed money transmitting business for forfeiture purposes. See Dkt. # 73, Affidavit of SA Brechler in support of Preliminary Order of Forfeiture.

The defendant also attempts to seek support from a FinCEN ruling regarding a software Company that sought an opinion from FinCEN as to whether their activities in dealing with bitcoin mandated them to register as an MSB. See Dkt # 89, Exhibit "B", pgs. 3-4. The government has already responded to and refuted this argument in its <u>Response to Defendant's Amended Objections</u> at Dkt. # 91 at pgs. 2-4, which is incorporated herein.

The defendant's insistence that he never transmitted funds on behalf of the public is belied by his own actions in selling his bitcoins. He advertised his services on the website LocalBitcoins.com. See Dkt. # 73, Affidavit of SA Brechler in support of Preliminary Order of Forfeiture at Exhibit 2. He attempts to draw a distinction and confuse this Court by arguing that he does not qualify as a business because he had arm's length, face to face, and personal transactions with the specific cooperating individuals identified in both the PSR and the affidavit of Special Agent Brechler. Unfortunately for the defendant, Congress did not create an exception or 'carve out' from the statute that makes such personal, face to face transactions exempt from a money transmitting business. This is the proverbial 'red herring' and does not allow the defendant to escape from the statute's prohibitions and requirements.

In addition, the defendant in his September 1, 2017 Statement with Respect to Sentencing Factors attempts to once again confuse the Court by citing to Title 31, United States Code, Section 5330 by pointing to a provision which deals specifically with the requirement of a money service business registering with the state where it operates and then citing a New York State banking regulation. See Dkt. # 92 at ¶¶25-26. However, that provision is to make clear that Section 5330's affecting state licensing requirements does not supersede any state regulations and has no application to the federal registration requirement for which Petix stands convicted. Again, this Court should not engage in this shell game which the defendant advocates.

The following are four excerpted SMS conversations between Petix and CD-1 ("Me") that illustrate that Petix was making money (i.e., operating a business and not a charity) from his bitcoin transactions:[3]

---

3 The above excerpts are derived from an analysis of the phone (a Samsung Galaxy 5S, model SM-S902L, cellular telephone, bearing IMEI number 990005823326880) that Petix had at time of his arrest.

1. This conversation spanning two days shows a few things. First, Petix agreed to a $3,000 transaction before even knowing the current market price for bitcoin. An investor who buys low and sells high does not sell blind like that. Second, when CD1 complained that the market went up and that he should have stayed up to meet Petix the previous night, Petix responded, "I like it when we both make money, but hind sight is only 20/20. I'm sure we will have other opportunities," suggesting that Petix would make money from this transaction even if CD1 wouldn't:

Oct 5, 2015, 5:43:03 PM Eastern Time: Me: Hey man. When this week are you headed to Buffalo?

Oct 5, 2015, 5:44:40 PM Eastern Time: Rich Rochester Btc Seller: I was just about to text you. I will be dropping my ma off tonight, then I should be back friday. Did you want to meet for anything tonight?

Oct 5, 2015, 7:30:42 PM Eastern Time: Me: I can do 3k tonight.

Oct 5, 2015, 7:31:36 PM Eastern Time: Rich Rochester Btc Seller: Beautiful, I'll be there around 845 if that's alright? What's the market been doing?

Oct 5, 2015, 7:32:36 PM Eastern Time: Me: It's at 242.7.

Oct 5, 2015, 9:40:57 PM Eastern Time: Rich Rochester Btc Seller: I'm sure was only expected but I'm running late as usual. Sorry about that bro I'll be there soon I'll call you when I'm 10 minutes away. Let me know if that's okay.

Oct 5, 2015, 9:42:41 PM Eastern Time: Me: Hey man. I'm falling asleep been awake since early. If you want I can get meet with you Friday when you come back.

Oct 5, 2015, 10:07:19 PM Eastern Time: Rich Rochester Btc Seller: I know how you feel bro, how much longer do you think you'll be up for?

Oct 6, 2015, 1:26:52 PM Eastern Time: Me: Man market jumped like crazy I should of stayed up lol.

Oct 6, 2015, 2:05:50 PM Eastern Time: Rich Rochester Btc Seller: I like it when we both make money, but hind sight is only 20/20. I'm sure we will have other opportunities.

Oct 6, 2015, 2:18:15 PM Eastern Time: Me: I've got cash and I'm good to go. You are back here Friday?

Oct 6, 2015, 2:48:51 PM Eastern Time: Rich Rochester Btc Seller: Either tomorrow or friday.

Maybe both. Would Friday be better for you? You were still thinking 3k?
Oct 6, 2015, 3:40:42 PM Eastern Time: Me: I can do more, let me see if my friend out of state wants some. Are you looking to sell a lot? I have 7k but not sure how much I should use up.

Oct 6, 2015, 3:56:06 PM Eastern Time: Rich Rochester Btc Seller: Hmm probably 35-40 should be good this time around. If that's to much , it's not an issue. I will do whatever suits you.

Oct 6, 2015, 7:24:46 PM Eastern Time: Me: Perfect. I should be able to take 5k. Just let me know.

2. Petix "need[s] that cold hard cash" for his bitcoins:

Oct 7, 2015, 6:07:08 PM Eastern Time: Rich Rochester Btc Seller: Hey bud, how does tomorrow around 8 sound?

Oct 7, 2015, 7:01:21 PM Eastern Time: Me: I'm not sure if I'll be in Buffalo at 8 tomorrow.

Oct 7, 2015, 7:12:58 PM Eastern Time: Rich Rochester Btc Seller: Where will you be, or what time will you be available?

Oct 7, 2015, 7:27:31 PM Eastern Time: Rich Rochester Btc Seller: I could possibly do it tonight. would you be able to do anything tonight?

Oct 7, 2015, 9:01:24 PM Eastern Time: Me: What time are you in town tonight? Or taking a special trip? I could possibly do it tonight. would you be able to do anything tonight?

Oct 7, 2015, 9:06:38 PM Eastern Time: Rich Rochester Btc Seller: Yes, it would be a special trip but I have plenty of bills, and I need that cold hard cash haha. What time would you be available until?

Oct 7, 2015, 9:07:43 PM Eastern Time: Me: Probably 1130.

Oct 7, 2015, 9:09:53 PM Eastern Time: Rich Rochester Btc Seller: Ok I'm heading out now.

3. For Petix, for CD1 to buy his bitcoins was helping out Petix by getting Petix cash:

Sep 28, 2015, 2:35:18 PM Eastern Time: Rich Rochester Btc Seller: Hey bud, I know and this is short notice. I will be heading out to Buffalo tonight around 7 o'clock, and should be there by 8 or so. Any possible way you would be able to set something up for tonight, or were you thinking later in the week? Let me know, thanks!

Sep 28, 2015, 2:36:16 PM Eastern Time: Me: Alright man. I'm buying 11 coin today. Let me check with someone else to see if they need coin Sep 28, 2015, 4:32:23 PM Eastern Time: Rich Rochester Btc Seller: Alright, I'll get them ready now. That way, I won't waste a bunch of time again haha. Is 830 ok for you?

Sep 28, 2015, 5:23:36 PM Eastern Time: Me: I can take 20,i can take more but I don't really need them and am scared if the market but we can make a deal if you need the cash bad or something.

Sep 28, 2015, 5:56:23 PM Eastern Time: Rich Rochester Btc Seller: No, I never need it that bad I guess. I will definitely throw you a little something extra for helping me out though . I really appreciate that! Can you send me an address so I can set up the trade now, and pull it out of my cold storage?

Sep 28, 2015, 6:00:05 PM Eastern Time: Rich Rochester Btc Seller: That way everything will be ready to go at the click of a button once to see you.

4. Petix could sell/transmit as many bitcoins as CD1 needed:

Sep 27, 2015, 6:53:31 AM Eastern Time: Me: Hey man. I should be able to grab coin this week, looking to sell?

Sep 27, 2015, 12:25:32 PM Eastern Time: Rich Rochester Btc Seller: Yea, I have a lot too. I would be willing to sell you what ever suits your needs though. Any idea how much you would need bud?

Sep 27, 2015, 3:47:01 PM Eastern Time: Me: What is a lot? 50?

Sep 27, 2015, 3:47:15 PM Eastern Time: Me: I can ask around for if people are looking.

Sep 27, 2015, 5:46:02 PM Eastern Time: Rich Rochester Btc Seller: I was thinking 40, but I can do 50 if it would make it more worth your while. Any idea when you would be available during the week?

At the last court appearance on September 13, 2017, the Court mentioned the Second Circuit's decision in *United States v. Velastegui*, 199 F. 3d 590 (2d Cir. 1999). While it is true that the *Velastegui* Court defined an unlicensed money transmitting business as one that obtains a fee for its services and must involve more than a single transmission of money to qualify as a "money transmitting business," that does not require all unlicensed money transmitting businesses to charge a fee as the statute does not require that. The *Velastegui* holding was derived from the specific facts of that particular case and is distinguishable from the case at bar. Petix ran a business and not a charity-it is clear that he made money. Petix's business model above is inconsistent with someone who trades in bitcoins to make money off

a fee or arbitrage in pricing. Rather, it is consistent with a vendor who regularly receives bitcoins as payment for some illicit goods and needs to launder the bitcoins into cash without much regard for the market value of the bitcoins.

## III. Relevant Offense Conduct:

The defendant has floated several different positions as to the offense conduct figures that the Court should employ in his sentencing. In his first Statement with Respect to Sentencing Factors and Objections to PSR, (Dkt. # 82 at p. 9), defendant seeks an offense conduct figure limited to $102,796.96 as he argues that the transactions defendant completed with the cooperating individuals was subsumed in the Bank of America deposits. Later in his Amended and Supplemental Statement with Respect to Sentencing Factors and Objections to PSR, filed on August 18, 2017 (Dkt. # 89 at p. 11), the defendant, without any basis or explanation, asks this Court to set such figure at $6,500 or less. Finally in his most recent submission entitled Statement of Defendant with Respect to Sentencing Factors filed on September 1, 2017, (Dkt. # 92 at ¶29), the defendant asks the Court to set the offense conduct figure at $116,000 (subtracting the $87,000 in bitcoin transactions from the $203,000 figure that the government submits is the true amount involved in the offense conduct).[4] The defendant's arguments supporting such variances from the PSR calculations come from his idea that him selling bitcoin to other parties does not make him a money transmitting business required to register with FinCEN, but rather merely an investor and nothing more. The defendant can continue to assert he was only an investor, but saying so does not make it so. He operated a business as thousands of citizens do, except he sold virtual currency as opposed to other retail goods.

The following sentencing guideline sections are relevant:

§1B1.3.Relevant Conduct (Factors that Determine the Guideline Range)

> (a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

4 The defendant continues to argue without any factual basis that the government double counted by including the $87,000 and the $102,000 in the Bank of America accounts, a notion clearly refuted by the government's Response to Defendants Objections, at Dkt. # 83 at pgs. 2-4.

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and;
>
> (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

*In United States v. Bove*, 155 F.3d 44, 47–48 (2d Cir. 1998), the court held:

> Guideline § 1B1.3 directs sentencing courts to consider all 'relevant conduct' when calculating a defendant's base offense level. In turn Guideline § 1B1.3(a)(1)(A)(emphasis added) defines 'relevant conduct' to include "*all* acts and omissions committed ... by the defendant ... that occurred during the commission of the offense of conviction." That broadly inclusive language clearly encompasses both charged and non-charged conduct. Relatedly, the interpretive and explanatory commentaries to Guideline § 1B1.3 confirm that a defendant need not have been charged or convicted of those related acts or omissions for them to qualify as relevant conduct. As Application Note 1 explains:
>
> The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator.
>
> That proposition is further confirmed by the Background comment:
>
> Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.

In *United States v. Crawford-Bey*, 401 F. App'x 624, 626 (2d Cir. 2010), the court noted that "[w]ith offenses such as the drug-related one at issue here, 'relevant conduct consists of all acts or omissions that were part of the same ... scheme or plan as the offense of conviction.'" (citing *United States v. Pellegrini,* 929 F.2d 55, 56 (2d Cir.1991) (per curiam). In *United States v Khanu*, 662 F3d 1226, 1227 (D.C. Cir. 2011), the Court looked at U.S.S.G. § 1B1.3(a) and noted that "relevant offense conduct for purposes of sentencing is not limited to acts for which

defendant is criminally liable and includes all acts and omissions committed by a defendant that occurred during the commission of the offense, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. *See United States v. Feola, 275 F.3d 216, 218 (2d Cir. 2001*) ("Appellant's argument that the district court cannot consider as relevant conduct activity that was not included in the indictment has no merit"). *See Fitzgerald,* 232 F.3d at 318 (holding that state and city tax evasion considered relevant conduct under conviction for federal tax evasion); *Olajide v. United States*, No. 01 CR. 365 (DC), 2005 WL 1925640, at *6 (S.D.N.Y. Aug. 11, 2005) (considering two separate offenses as part of a 'common scheme or plan' as relevant conduct for determining guidelines range); *United States v. Silkowski,* 32 F.3d 682, 688 (2d Cir.1994) ("relevant conduct provision of § 1B1 .3 is 'to be interpreted broadly' and relevant conduct can include conduct not charged in indictment.").

In the instant case, all of the defendant's transactions totaling $203,182.96 ($189,862.96 plus the last transaction with the law enforcement agent of $13,320) during the time-period of August 2014 and December 2015 should be considered as offense conduct as they were part of a common scheme and plan whereby the defendant illegally exchanged bitcoins to customers in the same fashion for a profit.

## IV. <u>Acceptance of Responsibility</u>

While the defendant continues to insist that he only transacted one bitcoin transaction for a fee, his guilty plea is an admission that he conducted, controlled, managed supervised, directed or owned all or part of an unlicensed money transmitting business from beginning in or before August 2015 until December 3, 2015. While his continued denial of any other qualifying transactions is troubling, the government does not object to the two (2) point acceptance of responsibility be applied to the defendant's ultimate offense level under the sentencing guidelines.

## V. <u>Clarification of the Record</u>

The applicable forfeiture statute in this matter is Title 18, United States Code, Section 982(a)(1). Title 18, U.S.C. Section 982(b)(1), holds that with regard to forfeiture cases all provisions of Title 21 U.S.C. Section 853 apply to forfeitures under this section with one exception, rebuttable presumption provision contained in Section 853(d). Therefore, the rebuttable presumption-does not apply to the instant case and this was misstated on the record. Our apologies to the Court for this misstatement.

Wherefore, based on Petix's guilty plea to the Indictment, we submit that the Court should find the relevant offense conduct in the amount of $203,182.96, since he admitted to operating an unlicensed money transmitting business from prior to and beginning in August 2014 through December 3, 2015 and we ask that the Court sentence him accordingly.

Very truly yours,

JAMES P. KENNEDY, JR.
Acting United States Attorney
Western District of New York

s/Richard D. Kaufman
RICHARD D. KAUFMAN
Assistant United States Attorney

s/Grace M. Carducci
GRACE M. CARDUCCI
Assistant United States Attorney

GMC:le

cc: Matthew R. Lembke, Esq.
Stephen M. Leonardo, Esq.