IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

ROCHESTER DIVISION

-----------------------------------

THE UNITED STATES OF AMERICA,

-versus- DOCKET NO: 15-CR-227

RICHARD PETIX,

Defendant.

-----------------------------------

TRANSCRIPT OF PLEA HEARING

BEFORE THE HONORABLE CHARLES J. SIRAGUSA

UNITED STATES DISTRICT JUDGE

WEDNESDAY, APRIL 26, 2017

A p p e a r a n c e s:

On Behalf of the Government:

Wei Xiang, Assistant US Attorney

On Behalf of the Defendant:

Mathew Lembke, Esq. and Stephen Leonardo, Esq.

R e p o r t e d B y:

Briana L. Jeffords

(Whereupon, the proceeding commences at 11:16 a.m.)

THE COURT: For the record, this is the matter of the United States versus Richard Petix. Hang on, Mr. Petix. For the record this is the matter of the United States versus Richard Petix. Bear with me one second. The Court notes the presence Mr. Lembke and Mr. Leonardo on behalf of Mr. Petix. Mr. Xiang is here on behalf of the Government. Mr. Petix, I was informed by your counsel that you want to plea guilty to the entire superseding indictment; is that correct.

THE DEFENDANT: Yes, your Honor.

THE COURT: And before going through the process and entering a plea, I just have to satisfy myself that your decision is being made knowingly, intelligently, and voluntarily. And I just want to recap the plea agreement that you turned down. If memory serves me correctly, you turned down a plea agreement that would have resulted in a recommended guideline range of 24 to 30 months in the agreement that was turned down, that the Government agreed to take the violation of supervised release in satisfaction as part of the plea agreement. And the Government further agreed that they would not pursue in the event that they could, anything contained on the zip drives -- zip drives or thumb drives?

MR. XIANG: The flash drives, your Honor.

THE COURT: Flash drives that we have discussed.

MR. XIANG: Judge, if I may add two things to what your Honor has said. With respect to the supervised release violation, it wasn't read into the plea offer that I made to Mr. Petix. I'm not on that case. What Mr. Resnick would have chosen to do, which if I understand, may have been to dismiss it, but it was not contemplated, but if it happened, it happened.

11:19:58AM

THE COURT: No, I thought -- Mr. Resnick come on up. I just want to make it clear. We were just discussing the plea agreement that was rejected. It was my understanding that Mr. Xiang correctly said supervised release violation in regards to the Government's position would have been the plea agreement and would have satisfied the supervised release violation or not.

11:20:12AM

MR. RESNICK: I don't think I had any conversation about that. Judge, I tried to call and left a message for counsel and never got a call back.

11:20:29AM

MR. LEONARDO: I didn't get that message.

MR. LEMBKE: As you recall, we were here two appearances ago and the issue in the supervised release came up when you had admonished both sides to work hard to see if a plea agreement could be reached. Mr. Xiang and I had conceded that we were very close, and you adjourned the matter. And at that point you asked about the supervised release. And on the record Mr. Resnick said that plea to the indictment would --

11:20:43AM

11:21:04AM

and I don't know his exact words. We can certainly get a transcript. But in essence, it would encompass the supervised violation of the supervised release terms. But your recitation of what's contained in this plea agreement is not accurate. There is nothing in this plea agreement that says it resolves all matters that stem from this transaction or his alleged possession of any electronic devices. It was very specific as to what he was pleading to. And it certainly didn't satisfy anything as related to the flash drives.

11:21:42AM THE COURT: I thought we discussed that last time. We did discuss it and no one corrected me. And I thought I indicated, Mr. Petix, that it was my understanding, and I thought I said this in court that a plea to the indictment with the guideline range of 24 to 30 months would satisfy the supervised release violation. And I may have misspoke, but I think I said that. And the Government would have agreed whether it was in the plea agreement or not, not to pursue anything with respect to the flash drives.

MR. XIANG: Judge, if I may comment as to the flash drives. We did it bring up. Your Honor asked me how long would it have taken to get into the flash drives in the future. We did have that discussion. It wasn't formalized in the plea agreement that we would have not pursued anything. It would have been a practical matter on my part to decide whether or not to even submit the flash drives if he were

sentenced on the tape.

THE COURT: I want to get a transcript then because I thought you conceded that you wouldn't pursue anything on the flash drives. I thought we had discussions on that.

11:22:55AM MR. LEONARDO: We did, and that is my recollection as well.

THE COURT: And that's why I think I want -- I was pointing out to Mr. Petix that, if eventually the Government could get into the flash drives, we are all being honest that 11:23:12AM there was suspicion that there might be some child pornography and some other things on it. I have no idea, but the possibility at least of considering the plea agreement because it would preclude any potential prosecution on what was found on the flash drives. I thought we discussed it pretty clearly 11:23:30AM last time.

MR. LEONARDO: I agree we discussed it very clearly. But so, your Honor, it is proper in how you balance this decision today. Nothing that what you just said is in this plea agreement, but there were other things in this plea 11:23:42AM agreement that would have requested his admission on his part that he is not prepared to admit to. Those things, the supervised release issue and the issue of flash drives is not part of this plea agreement. The Government had, through its representatives, made some concessions to the court, but they 11:23:58AM are not part of this plea agreement.

THE COURT: So just to be clear so I am clear, I thought when we were last in court, essentially, was that if he accepted the plea agreement, it would wrap up all the charges, potential or otherwise, including supervised release. That's not the Government's position?

MR. RESNICK: That may have been the case. I'm not sure about the supervised release. I don't remember having any discussion.

MR. LEONARDO: We did.

MR. RESNICK: If we did, that may have been part of what we decided in the plea agreement. We'd still have the issue of turning over the codes or the passwords which is kind of a concern for the Government because that's still a violation of his supervised release. But in any event, he turned down that plea agreement. So my understanding is that he's just here to plead to the indictment.

THE COURT: So he turned down the plea agreement. He wants to plead to the indictment. A plea to the indictment meaning that he could get up to -- actually, he could get up to 10 years in prison because there are two counts a maximum of five. He, obviously, would have his right to appeal. But the only right the appeal would pertain to is the sentence he serves; correct? He couldn't appeal to anything else.

MR. XIANG: That is my understanding, Judge. Now for the plea agreement, we did make it open ended.

THE COURT: The plea agreement, as Mr. Resnick said, is off the table. It is off the table. I want to make sure I understand and make sure the decision is knowing -- being made knowingly, intelligently, and voluntarily. In other words, if you plead to the indictment -- okay -- I'm not saying I would, but I can give you 10 years in prison. And you can get three more years on violation of supervised release. And the only appeal right that you would have is really to appeal the sentence. There are no other orders that I have made to appeal. The motion as to Count Two is withdrawn. So there is no order on that to appeal. So you are essentially pleading blind. I'm not criticizing that. I just want you to understand where I am coming from. You turned down this plea agreement that, again, I may have misunderstood it, but I was left with the impression last time that we were in court that it would wrap up everything. Now, you are pleading to the indictment. That still leaves the violation of supervised release that no one has indicated whether you are going to plead guilty or not guilty. Although, if you plead guilty to this, one of the charges contains the violation of supervised release. I haven't looked at it, but it's another federal, state, or local crime. So I just want to prepare you when I go through this because I'm going to ask you why you want to do this.

THE DEFENDANT: I didn't understand.

THE COURT: And additionally, the guidelines are now higher. You are clearly not entitled to the extra point. Unless the Government has some ulterior bad faith motive to get that point, they have to move forward to put in the statement they are not going to move forward. Now does it jump your guidelines tremendously? No, but it raises it from 27 to 33. So it raises your guidelines. Not that it matters, but again, because there was a lot of discussion about Count Two and whether you legally committed Count Two, that's off the table because that motion is withdrawn. I mean really academic, I don't know how long does it take to reach that issue, but that's not on the table. Do you understand all of this?

11:27:02AM

11:27:25AM

THE DEFENDANT: I do, but I didn't understand that the prior agreement included for me to satisfy all charges and --

11:27:39AM

THE COURT: I may have been wrong on that. That was my impression because I remember saying that in court.

THE DEFENDANT: If that is the case, I would have taken the agreement.

11:27:53AM

MR. XIANG: No.

THE COURT: Apparently, it wasn't in the agreement. I misspoke on that. So it wasn't in the agreement. I don't know if the Government -- is the Government still making efforts to get into the flash drives?

11:28:04AM

MR. XIANG: Not right now because we have them for trial. You know, we have the physical items. So -- but it would have been a function of, you know, what the sentence eventually is. And it may or may not be worth the effort to us by that time, but that is not something that I could state the option. And that is why in our discussions, I told them I couldn't make that promise to them, you know, before we came to court.

MR. LEONARDO: But he did say it to your Honor when we were in court last time that the plea would have effectively eliminated the Government's interest in pursuing anything that was not related. It was stated for the record, and I encourage the Court to get a transcript.

THE COURT: And I do recall those discussions. And who was here last time?

THE CLERK: It was taped, Judge.

THE COURT: You have the tape?

THE CLERK: It was taped, yep.

MR. RESNICK: Your Honor, again, I don't know the relevance of it because they turned down the plea offer that we had. There was nothing in the plea that I remember that we discussed. The supervised release which is normally the case, but they never came to me and asked me about it.

THE COURT: Correct. I did bring it up in court. I did say, and I thought the Government -- but you are also

correct that if I said that, it was refused in any event. So that really is academic. If I did say it as part of this. This is my understanding. The defense refused it. They wanted to go to trial.

11:29:32AM MR. LEONARDO: That's not true. That is not true, your Honor.

THE COURT: All right. Let's listen to the tape.

MR. LEONARDO: We didn't discuss that at the last appearance. It was the one before that.

THE COURT: Okay. I thought it was the last appearance when I was trying to clarify where we stood on plea negotiations. Let's -- can you get the tape?

THE CLERK: Yes.

(Whereupon, the tape was played.)

11:38:46AM THE COURT: All right. So I may have misspoke and no one corrected me.

MR. LEMBKE: Because there was a discussion that preceded that where you asked the Government did they access or could they access it, and there was a rather lengthy 11:38:59AM discussion. And the end result was that the Government had no desire to pursue it further if Mr. Petix should enter a plea. And that's, I believe, what lead to your comment or your belief that it was actually in the plea agreement. It wasn't, but it was a representation that was made upon a plea that 11:39:16AM would resolve the matter.

THE COURT: But in any event, even if I misspoke knowing Mr. Petix and the defense said they didn't want to avail themselves of the plea agreement. So we are back to the fact that Mr. Petix wants to plea to the indictment. And then that still leaves the violation of supervised release. And I'm looking at the guidelines of a violation of supervised release.

I am looking at Guideline Section 7(b)1.3 "now any term of imprisonment imposed not of any term of probation or supervised release should be ordered consecutively to any time of imprisonment whether or not that's early whether or not the sentence of imprisonment resulted from the conduct that the basis of revocation and probation of supervised release."

It's pretty clear that I have a lot of discretion on the supervised release violation. I am just, again, saying that I don't know why counsel -- I don't know why there were no discussions between counsel about what would happen if he pled guilty under the plea agreement. What would happen in the violation of supervised release. Apparently, there weren't according to the --

MR. LEONARDO: Judge, that is not true. That's not true. And I certainly didn't come here armed with the transcripts from the prior appearances, but there were not only discussions between Mr. Resnick and I about that variation, but there were comments from Mr. Resnick made to

this court about what the Government's position would be if --

THE COURT: Go ahead. I'm sorry.

MR. LEONARDO: There were conversations and representations made to this court about the Government's position on the supervised release violation if Mr. Petix resolved the matter which at the time was pending in Buffalo and --

THE COURT: Even assuming that was the case, Mr. Leonardo, I'm not trying to argue with you. Even assuming at best that Mr. Resnick says if he pleads under the plea agreement, we will take the supervised release in satisfaction as you suggest he may have said. Even assuming the best that the Government is saying that if you take the plea agreement, we have no interest in pursuing the flash drives, even assuming that, he didn't want it.

MR. LEONARDO: But I don't think that's what the Government said specifically because you are very careful in your words. And your words are that the Government said you should take the plea agreement. That's not what was said. The discussion wasn't in the context of the plea agreement or the absence of the plea agreement. The discussion was in the context of if he pleads guilty -- if he pleads guilty to these two counts, this is what our position is. They didn't say it had to be pertaining to the plea agreement. That wasn't part of the discussion.

THE COURT: Even if you understood that, even if you understood -- what you seem to be saying to me is that you understood that if he pled guilty under the plea agreement, even though it's not specifically stated in there, the Government would not pursue the violation of supervised release or take it in satisfaction and not pursue action with the flash drives. Is that what your understanding was?

MR. LEONARDO: My understanding was as to the supervised release, if we resolve the charges pending in Buffalo, that would satisfy the supervised release.

THE COURT: Even if that was your understanding and we discussed it on the record at some point, the Government is saying he refused it. He didn't want to take the plea agreement.

MR. LEMBKE: No, he wants to take the plea.

MR. LEONARDO: He wants to take the plea. There wasn't a condition that he had to plead personally to this agreement, which is objectionable from his perspective and other ways, if he pleads guilty which is what he is prepared to do today.

THE COURT: All right. So what you are saying -- and let me rephrase it -- if he pleads to the charges, irrespective of whether he did so by the plea agreement or the indictment, the Government represented, what, that that would satisfy the supervised release violation?

MR. LEONARDO: It would satisfy that in some way. And I don't recall. And I don't want to misspeak if that meant the time would -- that two would be deemed admission of the supervised release violation and the time would run concurrent, or if the Government would withdraw and dismiss it. I would have to go back to the transcript.

THE COURT: All right. But I -- I am trying to follow it. Are you also saying that at some point the Government represented that if he pleads to the charges, your perspective is whether it was by plea agreement or not, they would forego the flash drives?

MR. LEONARDO: That's what we talked about last court appearance at the tail end of what you just heard there.

THE COURT: So you plead to the indictment. Let's say you do that today. Then the Government says okay, we have to deal with the violation of supervised release. What do you do? You say they can't -- or if the Government came in and said they can't, or if the Government came in and said guess what, guess what we found on the flash drives, that they can't pursue anything on the flash drives because he plead to the indictment? I just want to make sure Mr. Petix is aware, because that seems to be exactly what you are saying. You seem to be suggesting that somewhere along the line whether it was here, I don't recall, or in Buffalo that the Government represented here is what our position is. That if Mr. Petix

11:45:28AM 11:45:44AM 11:46:03AM 11:46:11AM 11:46:23AM

pleads to the charges and they didn't qualify it by saying pursuant to a plea agreement, that if he pleads to the charges, then we are not going to look for any more time on the supervised release violation whether we are going to dismiss it or concurrent time. And we have no interest in the flash drives if he pleads to the charge. Is that what your position is.

MR. LEONARDO: That's what my understanding was after our last court appearance.

MR. XIANG: As to the flash drives, it is certainly not mine -- and it wasn't Mr. Petix's either. So for purposes of who -- the actual understanding, he and I are actually on the same page. Neither of us thought that we were just going to give up the flash drives. As a practical matter, maybe I would have. Under the plea, he could have asked for time served. I could have asked for 10 years. If the Court gave him 10 years, maybe I wouldn't have pursued the flash drives, but I couldn't say that ahead of time.

THE COURT: I just don't want Mr. Petix to plead to the indictment with the understanding that the Government is not going to go after the supervised release violation. You know, they are going to move to dismiss it or the Government is not going to, with the extent they can, get into the flash drives.

MR. RESNICK: With respect to the supervised

release violation, this case has been going on for 18 months. There may have been conversations 18 months ago when we had the first go around and said hey look, if you try to resolve the case in Buffalo when it was still there, maybe we can work something out here with the supervised release gets consumed in there. I don't believe, based on my memory, that I had any discussion with defense counsel on resolving the supervised release for months. And then when they entered into this plea agreement with defense counsel, what we normally do is we put in there the supervised release violation and then say we recommend it runs concurrent or consecutive. There was no conversation with me whatsoever about the supervised release violation. I never made a representation. I was surprised they didn't ask me about it. I called last week to discuss it with Mr. Lembke. I never got a call back.

MR. LEMBKE: I was gone. I was on vacation.

MR. RESNICK: I'm just saying I just tried to call. So your Honor, any plea negotiations we may have had are irrelevant. They were not contained in the plea agreement that he was going to enter into last week anything about the supervised release violation. Now he has turned that down. And second of all, we never make a plea offer to an indictment. Like if you plead to the indictment we will -- it's always with a plea agreement where we give up rights. They give up rights.

THE COURT: I'm not disagreeing with you. I am just clarifying now what Mr. Leonardo's understanding was. What I don't want to do is let Mr. Petix enter into a plea to the indictment without knowing the fact, unless the defense disagrees, that if he pleads to the indictment, he still has to deal with the violation of supervised release. And he still faces the possibility, if the Government can crack the flash drives and to the intent there is any type of criminal activity, they can pursue that against him because that's what I am going to discuss with Mr. Petix unless the defense says no they can't --

MR. LEONARDO: Judge, look what you are saying. Nothing you just said is in this plea agreement that Mr. Petix rejected. But if it were as Mr. Petix just told you, if that were in the agreement, then we probably would have in all likelihood --

THE COURT: But it wasn't.

MR. LEONARDO: It wasn't.

THE COURT: It wasn't so it's not the agreement, but what you're saying is --

MR. LEONARDO: But the Government is saying now, again, we would have had it in there.

THE COURT: They didn't say that. They said normally, there is discussions about it being contained in the plea agreement, but the plea agreement was rejected.

MR. LEONARDO: Because it didn't include --

THE COURT: I'm happy to take Mr. Petix's plea to the indictment as long as Mr. Petix -- I will ask you, why do you want to plea to the indictment? And I would explain to you if we are going to proceed that you still can be prosecuted in the violation of supervised release. You face up to three years or more on the violation of supervised release. And the Government has indicated that if it finds something on the flash drives, if he is able to do so -- I don't know what's on them. But if there is any criminal activity, they are going to pursue that against you. So with those understandings, Mr. Lembke and Mr. Leonardo, does Mr. Petix want to proceed and plead guilty to the indictment?

MR. LEMBKE: What I think we need to do is to -- Mr. Leonardo seems to think that there is a discussion on the record from the appearance prior to the most recent appearance.

THE COURT: Yes, but Mr. Lembke let's say that occurred. You are saying the Government said look, Mr. Petix, if at any time you plead to the indictment, even if we have to get ready for trial, we are going to throw in the violation of supervised release and we're going to give up the flash drives. I would be shocked if that's in the record. As long as you tell me you have a good faith basis for believing that, but it kind of defies logic honestly.

MR. LEMBKE: Well, there is nothing in -- look, the way I looked at this, and the way I analyze this is that under the plea agreement as it exists --

THE COURT: It's been rejected though.

11:50:56AM MR. LEMBKE: Wait a minute. And here's why, because there is not a thing in here in my view that benefits Mr. Petix. He's taking a plea. He is not getting a deal. I see the plea. I don't see the deal.

THE COURT: Okay.

MR. LEMBKE: For example --

THE COURT: Let me --

MR. LEMBKE: If he --

THE COURT: Let me get a word in. One might say okay. Did you go back to them at any time and say include

11:51:23AM something about supervised release?

MR. LEMBKE: No, but --

THE COURT: Did you go in there and say include in the plea agreement -- as it frequently happens -- include in the plea agreement something about giving up the flash drives?

11:51:35AM MR. XIANG: That they did, but they didn't ask me about supervised release which is natural. It wasn't on the supervised release.

THE COURT: In any event, we are beyond that. I can understand what you are saying. What you're telling me is

11:51:49AM listen, he gets no greater benefit. The only greater benefit

in the plea agreement is one point.

MR. LEMBKE: And in addition to that, he has to admit to certain relevant conduct which he tends to contest --

THE COURT: Okay.

11:52:05AM MR. LEMBKE: -- if he were to plead guilty under the agreement. And he has to agree to a forfeiture provision of that amount that he's contesting. And in addition to that, he would have to agree not only to a forfeiture provision that he is contesting, but he has to agree to pay a lump sum of

11:52:23AM $25,000 immediately. Okay. Now, I don't think that that's something the Court can order. If the Court orders forfeiture, the Court orders forfeiture. I don't think that the court will order -- I'm going to order forfeiture of $10,000, and I am going to order you to pay $5,000 of it

11:52:39AM today. I don't think you can do that.

THE COURT: Again -- and again, I'm at a disadvantage because I have not seen a plea agreement because it never got to that point.

MR. LEMBKE: And in addition to that, the

11:52:51AM Government has indicated that the defendant agreed to recommend -- could have asked the Court to a sentence of time served or to any other sentence outside of the recommended guideline range, but what it also says is the Government can do the same thing. And the Government can come in and say we

11:53:18AM think he should get more than the guideline range. Okay?

Now, I suppose the Government can do that now. Although, the Government has filed a limited statement indicating what it will be -- what the sentence will be. I suppose the Government deserves the right if he just comes in and just pleads guilty to the indictment to argue for sentence outside the -- above the suggested guideline range. But this plea agreement, other than the one point which lowers his guideline range, which is one of the many factors for sentencing, the low-end by three months and the high-end by --

MR. LEONARDO: Three months.

MR. LEMBKE: Three months. It's not a deal.

THE COURT: You clarified that. Clarify for me why the plea agreement is not, in your opinion, is not a benefit to Mr. Petix as opposed to pleading to the indictment. You have explained that to me. The conundrum is that Mr. Leonardo seems to have represented that the Government said that if he pleads to the indictment, we will give up on the supervised release violation and forego the flash drives and that does not appear to be the case. Can you explain why if he pleads to the indictment because, you know, it's the one point doesn't outweigh the disadvantages of the plea agreement. Explain that. And since the plea agreement did not include the violation of supervised release, it didn't provide any benefit.

MR. LEMBKE: Correct.

THE COURT: And since it didn't provide any statement concerning the flash drives, it's no benefit either. So I understand that. I'm still left with Mr. Leonardo's suggestion that he seems to be saying that the Government said if he pleads to the charges, that we will give up supervised release and forego the flash drives. That's what Mr. Leonardo seemed to have suggested. If we all agree that that's -- and I'm just trying to understand where the defense is coming from. So he pleads to the indictment. Now we schedule a hearing on the violation of supervised release. Is the defense going to come in and say he can't have the hearing on the supervised release because of some statement the Government made some time in the past? Or if Mr. Xiang is able to crack the flash drives and comes in and says, "Hey, look at this. We found evidence of fraud." Now you can't prosecute him on those because somewhere back in time the Government had stated that if he pleads to the charges, they wouldn't use the flash drives. That's all I'm trying to understand. You have explained to me why you didn't take the plea agreement.

MR. LEMBKE: Whatever is on the record in that regard will be hashed out. If they come and try to prosecute the supervised release violation, in the meantime, we will have received the record, and if we think we have an argument that they are stopped from doing so based upon the

representations in court, we will raise that argument. But what it sounds to me like Mr. Resnick is saying is that, "Oh, yeah, you know, we have talked about this, but I never" -- he is non-committal about what he will do or not do. And quite frankly, part of it might have to do with what kind of sentence your Honor gives Mr. Petix on his plea to the indictment. Suppose they think it's enough. Suppose you kill him and max him out. Maybe the Government thinks, well, you know what, what's the point of another 4 to 10 months on top of a five-year sentence? You know, maybe they are hedging their bets. I don't know what's going through their minds, but so pleading -- he needs to resolve the criminal case. He wants to resolve the criminal case.

THE COURT: You explained why he doesn't want the plea agreement. You have explained that to me satisfactorily. And I think Mr. Petix understands why you believe the plea agreement, as written, does not provide him with any type of advantage or benefit other than the one point which is not really -- which doesn't outweigh the disadvantages. So you have explained why pleading to the indictment makes sense from your point of view and why the recommendation remains with Mr. Petix. I'm satisfied with that.

I am also satisfied that we will have to deal with -- and there still remains the outstanding supervised release violation unless can you find something in the record where

Mr. Resnick says we will hold this offer in perpetuity. If at any time he pleads to the charges, we will give up on the supervised release violation. If you can find something like that, obviously, if Mr. Resnick said that, which I doubt if he said it, I'm sure you will honor it if you found it in the record.

11:58:29AM

On the other hand, if there is nothing there, then we have to proceed with the supervised release which is a no brainer because he would have plead guilty to a crime.

11:58:43AM

MR. LEMBKE: Correct.

THE COURT: And then I am confronted with the policy statement that the sentence run consecutively.

MR. LEMBKE: Correct.

THE COURT: You can argue the policy statement. I can accept it or not accept it. So we are all on the same page. And maybe you are right, maybe last time you offered -- you believe the Government could never break the password and get into those flash rides.

11:58:54AM

MR. LEMBKE: I don't know if I ever said never.

THE COURT: You did. I think you offered your expert opinion that they're not able to do that. I don't know. All I know is that the Chinese got my freakin' -- all my records, and social security number, and fingerprints. So they must have something. So hopefully --

11:59:08AM

MR. LEMBKE: I think my wife just bought a sofa on

11:59:25AM

your credit card.

THE COURT: I'm sure. She probably did. Somebody in China is now driving around in a car on my dime.

MR. LEMBKE: So --

11:59:38AM THE COURT: So let's proceed.

MR. LEMBKE: -- let's do this.

THE COURT: Mr. Petix, please raise your right hand.

MR. LEMBKE: Are you ready to go?

11:59:46AM THE DEFENDANT: There was one thing I didn't really understand.

MR. LEMBKE: All right.

THE DEFENDANT: If I plead openly, see I was under the assumption that these things would count if I plead openly or if I plead with an agreement. Now, I'm told they don't count regardless of what I do.

12:00:00PM

MR. LEMBKE: Nobody said -- and what I am saying after we hash this out today is it seems as though the Government's position is that they did not make a commitment in connection with the supervised release violation irrespective of whether you plead guilty under an agreement -- of a written agreement or whether you just walked in and pleaded guilty. So that is irrelevant. All right?

12:00:17PM

THE COURT: In other words, if you plead to the indictment, all that involves is the indictment. It does not

12:00:38PM

resolve, in any way, the violation of supervised release in connection to the charges. And as Mr. Lembke has pointed out and I think clearly the plea agreement if accepted, it didn't resolve those anyway.

12:01:01PM THE DEFENDANT: I was told by my attorney that they wouldn't pursue a violation of probation if I plead guilty either with an agreement or without an agreement. So I mean, I feel like I'm being misinformed here, honestly.

MR. LEMBKE: Well, to the extent that we informed 12:01:19PM you that, we did misinform you of that because that was our understanding. And we are being told now right here, next to you, 10 feet away, by the Government that it was never the agreement. So that's our misunderstanding. So where we are now is that that is just a thing that we thought based on 12:01:42PM conversations we had with the Government and which the Government is now denying. So let's go back in time and say look Rick, whether you plead guilty to plea agreement or whether you plead guilty to the opened supervised release violation, the supervised release violation is going to have 12:02:01PM to be dealt with on its own at this point.

THE COURT: And let me just emphasize one thing that I emphasize to all defendants. Obviously, you are represented by good counsel, know that. But ultimately the decision to plead guilty whether it's to take a plea agreement 12:02:17PM or plead to the indictment is yours alone. So just to be

clear if you plead guilty to this indictment, it only resolves the two charges in the indictment. It does not resolve the violation of supervised release which carries a potential of three more years to run consecutively nor does it in any way resolve what the Government may find on the flash drives. I have no idea what they may find. So you need to understand that. Do you?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you want to proceed to plead to the indictment?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. Do you need more time to discuss it with your lawyers? Because I get the feeling, you know, I just get the feeling, Mr. Petix, and it might be me. I might be wrong that you are a little confused and hesitant. So you need to tell me if you are good to go.

THE DEFENDANT: The Government agreed to certain things in the transcripts. I think we should have time to get the transcripts. And because I was told a certain thing and now it's changing on to what I was told. And I mean, I think we should get the court transcripts and see.

THE COURT: Well if we don't resolve this, this case is going to trial on Monday.

MR. LEONARDO: Right. So --

MR. LEMBKE: Right. And the point is that if the

Government has made representations on record, we will know that prior to the time that we come in here on a supervised release violation and prior to the time you are sentenced here. So it does not impact --

12:03:55PM THE COURT: But you are not going to know that now. And I'm telling you point blank, and I could be wrong, but I have been doing this for a lot of years. I know no case where the Government has said they are holding off or open -- even assuming, the Government has said that if you plead to the 12:04:10PM indictment -- I never heard him say that. I have never heard the Government say that if you plead to the charges, whether it's by plea agreement or the indictment, that we will forego something. I never heard them say that, and I have been here for 20 years. Now, they may have said that in this case, but 12:04:28PM I have never heard them say that. Nor have I ever heard them say to the extent that they made any type of offer that they would hold it open indefinitely.

So I'm telling you, honestly, you got good lawyers. They may find something there, but you should not assume 12:04:40PM that's going to happen. You should not. So if you plead -- if you want to plead under this indictment, I'm telling you to assume that you are going to be facing a violation of supervised release and that you face the possibility that the Government may get into the flash drives. So assume those two 12:05:00PM things. Okay?

THE DEFENDANT: Okay. You can't tell me whether or not you would be inclined to run the violation consecutive?

THE COURT: No, all I am telling you -- that's why I read this section. Now, these are policy statements. I can reject them or not, but I read the section of the guideline that said the sentences can run consecutive. Now, do I have to follow them? No. But I am not making any kind of promises. I have to look at the presentence investigation report before I can make any determination. So could it run? The bottom line is if you want to plead, I'm going to tell you this. I am going to tell you that I can give you 10 years on this. I'm not saying I would, but I got tell you that I could.

THE DEFENDANT: Right.

THE COURT: And I could give you three more years on the violation of supervised release. Again, I am not saying -- I have to tell you that I could do that so you enter your plea knowingly, intelligently, and voluntarily.

THE DEFENDANT: I understand, your Honor. I am willing to plead guilty to the indictment openly right now.

THE COURT: You want proceed then?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. I'm going to ask you to raise your right hand, please.

R-I-C-H-A-R-D P-E-T-I-X,

called herein as a witness, was examined
under oath and testified as follows:

THE COURT: Okay. Put your hand down. What you have done, as I'm sure you are aware Mr. Petix, is that you swore to tell me the truth. I assume you are going to tell me the truth. But if you don't, if you were to lie to me, it would be another crime called perjury that you could be prosecuted, convicted, and persecuted of. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: The purpose of this proceeding, I think we have made it clear but I will tell you again, for me to ask you questions to make sure the record is clear. Now the record is what our court reporter is taking down. It is clear that you know what are you doing and this is what you want to do. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: And I want to emphasis another point. If at any time while we are going through this you have any questions for me, all you have to do is stop me, ask me your question, and I will do my best to answer. Okay? And you know, I have tried to do that.

THE DEFENDANT: Thank you, your Honor.

THE COURT: And I'm telling you if you have any questions, stop me. First of all, could you tell me how old

you are?

THE DEFENDANT: I'm 32 years old.

THE COURT: And how far have you gone in school?

THE DEFENDANT: I got my GED.

12:07:18PM THE COURT: So you can read, write, and understand English; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: Are you currently under the care of a medical doctor for any kind of physical issues?

12:07:26PM THE DEFENDANT: No, your Honor.

THE COURT: Mr. Petix, have you ever been treated, or hospitalized, or confined for any type of emotional or mental disorder?

THE DEFENDANT: No, your Honor.

12:07:36PM THE COURT: Now, you did undergo some sex offender treatment; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: But apart from that, no diagnosed mental condition; is that right?

12:07:43PM THE DEFENDANT: No, your Honor. Well, ADHD.

THE COURT: How long ago?

THE DEFENDANT: I mean, I was prescribed Adderall up until the time I came here. So I mean, that's a diagnosis I've had since I was a child.

12:07:57PM THE COURT: And here is why I ask you, I'm not

trying to pry, but I want to make sure that if you have any type of condition, physical or mental, that the condition doesn't interfere with your ability to understand what's happening here in court. Do you understand why I am asking the question?

12:08:12PM

THE DEFENDANT: Yes, your Honor.

THE COURT: And would it be fair to say to the extent that you do have ADHD, you are none-the-less able to understand what is happening in court; is that correct?

12:08:23PM

THE DEFENDANT: Yes, your Honor.

THE COURT: Are you addicted to alcohol?

THE DEFENDANT: No, your Honor.

THE COURT: Are you addicted to drugs?

THE DEFENDANT: No, your Honor.

12:08:29PM

THE COURT: You have been in for how long now?

THE DEFENDANT: Seventeen months.

THE COURT: At Seneca or Monroe?

THE DEFENDANT: Monroe County.

THE COURT: Any drugs or alcohol during that time?

12:08:40PM

THE DEFENDANT: No, your Honor.

THE COURT: Now in regards to your decision to plead guilty to the indictment, have you had occasion to discuss with Mr. Lembke and Mr. Leonardo the Government's case against you? By that I mean, the proof the Government has that you did commit these charges?

12:08:52PM

THE DEFENDANT: Yes, your Honor.

THE COURT: And have you also discussed with Mr. Leonardo and Mr. Lembke what the result might be if you went to trial? In other words, whether you would be found guilty or not guilty?

THE DEFENDANT: Yes, your Honor.

THE COURT: Based on your conversation with them, do you believe pleading to the indictment is what's best for you to do?

THE DEFENDANT: Yes, your Honor.

THE COURT: And just to recap, that decision was based on your conversations I take it with Mr. Lembke and Mr. Leonardo about the plea agreement that was offered; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: And specifically, as Mr. Lembke referenced, the plea agreement had some unfavorable provisions coming up with $25,000; is that right?

THE DEFENDANT: Yes, your Honor.

THE COURT: And also as Mr. Lembke reflected, the plea agreement did not, as the Court mistakenly believed in any way resolve the supervised release violation or require the Government if you entered the plea agreement to forego and give up what might be on the flash drives; is that also correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, have you had sufficient time to confer and discuss the evidence and the issues with Mr. Lembke and Mr. Leonardo before coming to court today to plead guilty?

12:10:19PM THE DEFENDANT: Yes, your Honor.

THE COURT: And are you -- and to the extent that you had questions, I kind of know this answer, but I want to ask you none-the-less. To the extent that you had questions about the wisdom of pleading to the indictment as opposed to 12:10:36PM entering into the plea agreement or as opposed to going to trial, did you ask those questions of Mr. Lembke and Mr. Leonardo?

THE DEFENDANT: Yes, your Honor.

THE COURT: And did they answer your questions for 12:10:48PM you?

THE DEFENDANT: Yes, they did.

THE COURT: And based upon your conversations with them, again, do you believe that pleading to the indictment is what's best for you to do?

12:10:57PM THE DEFENDANT: Yes, your Honor.

THE COURT: Tell me in your own words why. I know we discussed it, but tell me.

THE DEFENDANT: Because there is no known benefit for me to accept this plea agreement when all I will get is a 12:11:09PM one point reduction for acceptance and responsibility. And I

will be subject to restitution -- well, not restitution, but a civil forfeiture provision. So yeah, the amount that we can't contest in the plea agreement -- or issues that we can contest openly and we can't contest it if I plead to the agreement.

12:11:30PM THE COURT: And again, I think I have seen the agreement that Mr. Lembke referenced, and I'm sure you discussed the agreement doesn't say anything about the flash drives; is that correct?

THE DEFENDANT: It does not, your Honor, except 12:11:42PM that I would have to forfeit them upon signing the agreement, and I believe this states the same thing though so --

MR. LEMBKE: Well, no. This agreement is just the Government's position, their opinions, upon what should happen if you plead guilty without the plea agreement. It doesn't -- 12:12:05PM this doesn't --

THE COURT: This isn't like --

MR. LEMBKE: It doesn't obligate you or it doesn't obligate the Government in any way.

THE COURT: That is a good point that Mr. Lembke is 12:12:17PM making. What the Government does is they submit to me the statement which is kind of the guideline for me, but it's not binding on me nor is it binding upon you. You could contest, for example, if you disagreed with their guideline conditions, you can contest those. Again, it's just kind of a blueprint 12:12:32PM for me to proceed. Does that make sense?

THE DEFENDANT: It does, your Honor.

THE COURT: Okay. Now, I know you understand this, but I am going to ask and tell you none-the-less, you are aware, are you not, that crimes are divided into two broad categories, misdemeanors and felonies?

12:12:40PM

THE DEFENDANT: Yes, your Honor.

THE COURT: Felonies, do you understand, are the more serious crime because once convicted of a felony, you can receive in excess of one year in a federal prison? Do you understand that?

12:12:53PM

THE DEFENDANT: I do, your Honor.

THE COURT: Do you understand that the two crimes in which you will be pleading guilty to in the subject superseding indictment are both felonies? Do you understand that?

12:13:01PM

THE DEFENDANT: I do, your Honor. Yes.

THE COURT: Now, if you take a look at what's called the Intel statement, do you have that in front of you? Do you see under maximum sentence on page one?

12:13:12PM

THE DEFENDANT: Yes, your Honor.

THE COURT: Now that actually indicates that Count One which is a material false statement that if you are convicted of this, whether it's by pleading guilty or after trial, you could receive up to five years in prison. You could be fined up to a quarter of a million dollars. You must

12:13:25PM

pay a mandatory of $100 special assessment that everyone convicted of a felony must pay. And you are looking at a term of supervised release up to three years. Do you understand those are the maximum penalties you face with respect to Count One of pleading guilty?

12:13:44PM

THE DEFENDANT: Yes, your Honor.

THE COURT: If you look at paragraph two, that boxes out Count Two of the indictment. Again, when you plead guilty or if it's after trial, you could receive up to five years in prison, quarter of a million dollar fine. You have to pay a second $100 special assessment because it is a second felony. And again, you are looking at a term of supervised release for three years. Do you understand those are the maximum penalties you face for pleading guilty to Count Two?

12:13:57PM

THE DEFENDANT: Yes, your Honor.

12:14:18PM

THE COURT: So you tell me what's the most you can get on Counts One and Two.

THE DEFENDANT: Ten years.

THE COURT: Exactly, ten years because I could sentence you consecutively on both. Now, I mentioned supervised release, and you have discussed that with Mr. Lembke, is that correct, and Mr. Leonardo?

12:14:26PM

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand that supervised release is a type of probation or parole?

12:14:41PM

THE DEFENDANT: I do.

THE COURT: I know you understand this, but I'm asking you none-the-less. And you understand that after any prison sentence you serve, I will place you on supervised release for a number of years. Do you understand that?

THE DEFENDANT: I do.

THE COURT: And do you understand that while on supervised release, you must abide by conditions I set and the probation office sets? Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: And do you understand with respect to these two counts because you still would be on supervised release for the child pornography count, but with respect to these two counts, if you were on supervised release and it was ever proven to me by a preponderance of evidence that you violated the terms and conditions, then I can put you back in prison for how long, Mr. Xiang, two years or three years for violation of supervised release?

MR. XIANG: For these, it would be two years.

THE COURT: Two years without giving you any credit for the time you have done on supervised release. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: And if you go over to --

MR. LEMBKE: I think it's actually -- the maximum

penalty is actually three years. Grade Violation B Criminals Category 1, guideline imprisonment maximum penalty three years.

THE COURT: That's the statute penalty, but I don't know if that's the maximum for supervised release.

12:16:02PM

MR. XIANG: Yes, your Honor. It is two years because these are D felonies. So it's two years for each violation. So technically up to four, but two part.

THE COURT: Do you understand that?

12:16:19PM

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Now, as you know, sentencing on this and we have discussed this in your prior case. Sentencing in this action is pursuant to the Sentencing Reform Act of 1984. In that regard, the Court will consider the sentencing guidelines. Do you understand that?

12:16:35PM

THE DEFENDANT: I do.

THE COURT: And did you discuss the guidelines with Mr. Leonardo and Mr. Lembke?

THE DEFENDANT: Yes, I have.

12:16:43PM

THE COURT: And do you understand that under these guidelines as the sentencing judge I have to determine two numbers. One would be your offense level. The other would be your criminal history category. And then these two numbers would be a recommended range from the guideline range for which you should be sentenced. Do you understand that?

12:16:55PM

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you also understand that it's my obligation as the judge before I sentence you to review a document in which you will be interviewed called a presentence investigation report?

THE DEFENDANT: Yes, your Honor.

THE COURT: And do you understand that this document among other things will include the crime to which you plead guilty -- the crimes in which you plead guilty, the facts and circumstances and will make recommendations to me and to the probation office as to what the correct numbers are under the advisory guidelines. And very importantly, again, although I know a lot about you, it will tell me about and me remind me about Richard Petix. For example, you told me you had your GED. It will remind me about your education. It will tell me about your prior criminal record. It will indicate to me about whether or not you've -- I don't recall whether you have ever worked. The kind of jobs you had. It will tell me about you mentioned ADHD. It will tell me a little bit about that. And whether you had any issues with drugs or alcohol. It will tell me about your family whether you're married or have any kids. It will give me some, again, insight into your finances among other things. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand it's my responsibility as a sentencing judge to carefully review the pre-sentencing report and then sentence you to what I believe is just, fair, appropriate, and reasonable, under the law. Do you understand that?

12:18:14PM

THE DEFENDANT: Yes, your Honor.

THE COURT: And again, with respect to sentencing, you know how it works. That what I would have -- what I would do is I would tell you at sentencing my determination on the guidelines. I'd listen to what your lawyers have to say. I will listen to what the Government has to say. But I want to be clear that you could get up to 10 years prison. Do you understand that?

12:18:33PM

THE DEFENDANT: I understand, your Honor.

THE COURT: Now with respect to the advisory sentencing guidelines, I want you to go to the statement that the Government provided on page -- go to paragraph five. Again, this is not gospel. You can contest this, but I think the Government is probably correct that your base offense level would be six on Count One. That with respect to Count Two, it would be 16. That there would be a two level increase because you knew or believed the funds were intended to promote unlawful activity. Again, the Government -- you can contest these. If the Government is correct, that means your adjusted offense level is 18. On the accepted responsibility

12:18:45PM

12:19:03PM

12:19:30PM

level, we talked about that. The Government is not going to impose a two level reduction for acceptance, but they are going to oppose by not moving that third one. And unless the Government is acting in bad faith towards that third one, they have to move for it. Do you understand that.

12:19:55PM

THE DEFENDANT: Yes, your Honor.

THE COURT: So that means if the Government's calculations are correct, your adjusted or final offense level would be 16. Now, your criminal history category, at least as

12:20:11PM

the Government has calculated it, is three. And that's based on your prior conviction for child pornography and the fact that you committed these crimes while on supervised release for that crime set forth in paragraph 10. Do you understand that?

12:20:31PM

THE DEFENDANT: Yes, your Honor.

THE COURT: So if the Government is correct and you get two points for acceptance and your offense level is 16 your criminal history category is three, the recommended range under the advisory sentencing guideline would be 27 to

12:20:48PM

33 months in prison. That would be, what, two years three months to two years nine months, if my math is right, in prison. The fine range would be $10,000 to $95,000. And the period of supervised release would be one to three years. And of course, you have to pay the $200 in special assessment. Do

12:21:07PM

you understand that?

THE DEFENDANT: Yes, your Honor. So if I'm pleading guilty, do you have to impose the fine of $10,000?

THE COURT: No, I don't have to.

THE DEFENDANT: Okay.

12:21:14PM THE COURT: You know, and I will tell you what I typically do is I -- do you remember in the child pornography presentence investigation report probation does something on your finances?

THE DEFENDANT: Yes, your Honor.

12:21:30PM THE COURT: So I see your financial ability to pay a fine and make a determination.

THE DEFENDANT: Okay.

THE COURT: So no, I don't have to order $10,000. Does that make sense?

12:21:41PM THE DEFENDANT: It does make sense.

THE COURT: Okay. Now, one of the things I want bring up is, because it was brought up, there is this issue of forfeiture. Now, are there items the Government would intend to seek forfeiture on should he plead guilty?

12:22:01PM MR. XIANG: Yes, your Honor. It's numerated in paragraph three.

THE COURT: Okay. I missed that. Let's go to paragraph three.

MR. XIANG: And that provision the three sets of

12:22:10PM items under electronic equipment, those came straight out of

the indictment itself and the money judgment as well.

THE COURT: Okay. Where is -- now, which brings up a point, are the forfeiture allegations, are they -- he doesn't a have to acknowledge the forfeiture allegations to plead to the indictment; is that correct?

MR. XIANG: I think we will have to contest it. There are four -- essentially four different pieces of forfeiture. One, the money judgment I think is open ended. It will be up to the Court. It will be completely contested. As for the --

THE COURT: But I just want to clarify, a plea to the indictment means he is just pleading to the two charges in the indictment not the forfeiture count for the allegation; is that correct?

MR. LEMBKE: It is correct. As a matter of fact, I don't think that when you are arraigned you even need to plead guilty, or not guilty, or admit, or deny on forfeiture allegations.

THE COURT: I want to make sure we are all clear on that. Do you agree with that Mr. Xiang?

MR. LEMBKE: I think those are all conditional things that the Government is required to prove if they intend to seek forfeiture.

MR. XIANG: He will be subject to forfeiture, but it will be for the Court to determine.

THE COURT: What you are saying is he can contest any of the items the Government thinks they are -- shows they are forfeitable, but he can contest them; is that correct?

MR. XIANG: Yes, that seems to be.

12:23:53PM THE COURT: All right. But in any event, Mr. Petix, you know the Government intends to seek forfeiture.

THE DEFENDANT: I do, your Honor.

THE COURT: What does forfeiture mean?

THE DEFENDANT: Seize my property.

12:24:03PM THE COURT: Yes, they intend to seize the items specified under the forfeiture allegation contained in the indictment. Now whether or not those items they claim are forfeitable including money, you know, the money judgment, that will be up to me to decide. Do you understand that?

12:24:21PM THE DEFENDANT: Yes, your Honor.

THE COURT: Also, you have the ability by pleading to the indictment to appeal the sentence I impose. Do you understand that?

THE DEFENDANT: Yes, your Honor.

12:24:37PM THE COURT: But I do want to be clear on this because we spent a lot of time on that second count. You have no right to appeal your conviction on the Second Count. Do you understand that?

THE DEFENDANT: Yes, your Honor. I would only have

12:24:51PM the right to appeal it if you sentence me outside the

guideline range; is that right?

MR. LEMBKE: No.

THE COURT: You know, even if I sentence you in the guideline range, you can appeal anything. You have the right to appeal any aspect of the sentence I impose. I'm just pointing out because we spent a lot of time on that second count that I have not made -- you withdrew your motion to dismiss the second count. So there is -- I have not made any ruling. So there is nothing to appeal from. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now so far, do you have any questions? Do you have any questions for me?

THE DEFENDANT: No, your Honor.

THE COURT: Now, the next thing I need to do is I need to go over your rights. You give up, when you plead guilty, your right to go to trial. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: As I tried to emphasis, if you have any questions, what you are going to do?

THE DEFENDANT: I will ask you.

THE COURT: Ask me. If you want to ask your lawyers, you can, but you can ask me. Do you understand that?

THE DEFENDANT: Okay.

THE COURT: Do you understand under the law you do

have the absolute right to plead not guilty and go to trial on these charges? Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: And do you understand that if you want to go to trial, you would be entitled to what is called a trial by jury?

THE DEFENDANT: Yes, your Honor.

THE COURT: Further, do you understand if you did want to go to trial, you would be entitled to continued representation by Mr. Lembke and Mr. Leonardo at trial and in fact at all stages in the proceedings, or if the point came where you could no longer afford them, I would appoint you a lawyer free of charge? Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Further, do you understand that if you do want go to the trial, it would be up to Mr. Xiang on behalf of the Government to call witnesses and present evidence against you? Do you understand that?

THE DEFENDANT: I do understand that.

THE COURT: Additionally, do you understand that if you did want to go to trial Mr. Lembke and Mr. Leonardo on your behalf could cross-examine and confront any witnesses that Mr. Xiang calls to testify against you, and they could challenge any other evidence that was sought to be introduced against you. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Furthermore, do you understand that if you did want to go trial, you would have the right to testify in your own defense or the right not to testify? If you wanted, you could call witnesses as part of the defense case and even tell them to testify by subpoena, or introduce other evidence, or choose not to do that. And I want you to understand that if in fact you chose not to testify or if you chose not put in any evidence as far as the defense's case, I would specifically explain to the jury that they could in no way consider such factors as any evidence of your guilt. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Next, do you understand that before a jury can find you guilty of one or both of the charges, the jury considering each charge separately would have to find as to the charge under consideration that the Government has proved the requisite that is necessary elements to the crime beyond a reasonable doubt. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Let's look at page two of that statement because the Government has set forth what they would have to prove with respect to Count One. They would have to prove beyond a reasonable doubt these elements: That on or about December 3rd, 2015, you made a statement of

representation. Second, they would have to prove beyond a reasonable doubt that the statement of representation was material. Third, they would have to prove beyond a reasonable doubt that the statement of representation was false, factitious, or fraudulent. Fourth, they would have to prove beyond a reasonable doubt that the false, factitious, or fraudulent statement was made knowingly or willfully and not by accident or some other reason. And lastly, they would have to prove beyond a reasonable doubt that the statement of representation was made in the matter within the jurisdiction of the United States. And if you made a statement to the probation office that the Government would maintain that that would be a matter within the jurisdiction of the United States. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: But in any event, what I want you to understand is that I would tell the jury if the Government failed to prove any one or more of those five elements beyond a reasonable doubt, they would have to find you not guilty on Count One. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: With respect to Count Two, the Government would have to prove beyond a reasonable doubt that the Bitcoin activity was a money transmitting business. Second, they would have to prove that the business was

unlicensed. Third, they have to prove beyond a reasonable doubt that you knowingly controlled, conducted, managed, supervised, directed, or owned the business. And lastly, they would have to prove beyond a reasonable doubt that the money transmitting business effected interstate commerce. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: With respect to interstate commerce, transactions that crossed the state lines whether by computer or otherwise that would impact interstate commerce. Do you understand that?

THE DEFENDANT: I do.

THE COURT: Again, as to this count, I want you to understand that I would tell the jury that if the Government failed to prove any one or more of those elements beyond a reasonable doubt, they must find you not guilty of Count Two. Do you understand that?

THE DEFENDANT: I do, your Honor.

THE COURT: Also, do you understand that before the jury can find you guilty of Count One, or Count Two, or both, they must be unanimous in their verdict. Now, what does that mean? That means all 12 people, 12 people normally sit on a criminal course in federal court or in some unlimited circumstances 11, each juror for himself or herself must find as to the count they are considering, the Government has

established the requisite elements beyond a reasonable doubt before the jury could then return a verdict of guilty on that count. Do you understand that?

THE DEFENDANT: Yes, your Honor.

12:31:02PM THE COURT: Do you understand that by pleading guilty you are giving up all of these rights?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand that by a plea of guilty it is the same as if the jury found you guilty after trial?

12:31:11PM

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, I have to tell you -- is this your second or third felony conviction?

THE DEFENDANT: Well, it's my second.

12:31:19PM THE COURT: Okay. I want to explain to you that, obviously, we live in the state of New York. And under New York law with two or more felony convictions, you are going to permanently lose certain civil rights. You are going to permanently lose your right to hold certain licenses, or

12:31:35PM offices, and while you are in prison and while on supervision, you are going to lose your right to vote. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now listen carefully to this: Other

12:31:42PM than the promises -- excuse me -- has any promise been made to

get you to plead guilty?

THE DEFENDANT: No, your Honor.

THE COURT: Has anyone forced to you plead guilty?

THE DEFENDANT: No, your Honor.

12:31:53PM THE COURT: Has anyone threatened you to get you to plead guilty?

THE DEFENDANT: No, your Honor.

THE COURT: Again, are you pleading guilty to the indictment because based on your conversations with Mr. Lembke 12:32:01PM and Mr. Leonardo given the facts and circumstances that you believe this is what's best for you to do?

THE DEFENDANT: Yes, your Honor.

THE COURT: Mr. Petix, have you answered my questions truthfully?

12:32:14PM THE DEFENDANT: Yes, your Honor.

THE COURT: Do you have any questions for me because now would be your final opportunity?

THE DEFENDANT: No, your Honor.

THE COURT: Now before I accept your plea of 12:32:22PM guilty, you are going to have to tell me what you did. In that regard, I'm going to refer to the indictment. Now Count One says on December 3rd, 2015, in the Western District of New York you in the matter of the jurisdiction of the judicial branch of the Government of the United States knowingly, 12:32:42PM locally, and unlawfully made a materially false, and

fictitious, and fraudulent statement of representation that is that you did deny to an officer of the United States Probation Office in the Western District of the United States that you owned and had access to a smart phone. Now, let me stop you. As of December 3rd, 2015, you were on supervised release; is that correct?

12:33:03PM

THE DEFENDANT: Yes, your Honor.

THE COURT: And who was your supervising probation officer?

12:33:10PM

THE DEFENDANT: Ivett Hernandez.

THE COURT: Ivett Hernandez. And on December 3rd, 2015, did you have conversations with Ms. Hernandez relating to the smart phone?

THE DEFENDANT: Yes, your Honor.

12:33:23PM

THE COURT: And the smart phone at issue is, correct, it was a Samsung Galaxy?

THE DEFENDANT: That is correct.

THE COURT: 55 model SMO2L; is that correct?

MR. LEMBKE: S5.

12:33:42PM

THE COURT: SM5 model 9021.

MR. LEMBKE: He is not supposed to have a smart phone, and he had one. It was a Samsung Galaxy.

THE COURT: Is that correct?

THE DEFENDANT: That's correct.

12:33:56PM

MR. XIANG: And your Honor, if I can just

interject. It was, technically, not a statement to Ms. Hernandez that is the charge, but to an Officer Langotti and Smith. So there were two other officers that were there.

THE COURT: Is that correct? So there were two --

12:34:08PM THE DEFENDANT: I'm sorry. It was what?

THE COURT: So it was -- Mr. Langotti is Caucasian, and Mr. Smith is an African American.

THE DEFENDANT: Oh, yes.

THE COURT: So the statement at issue was made to them; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: And is it true that you lied to them when -- and told them that you didn't own or have access to the Samsung Galaxy; is that correct?

12:34:34PM THE DEFENDANT: Yes, your Honor.

MR. LEMBKE: We like to say he made a material false statement.

THE COURT: Why don't we get to the heart of it, but that's fine. Material false statement, you know what I'm saying. You didn't tell them the truth; is that correct Mr. Petix?

THE DEFENDANT: Yes, your Honor.

THE COURT: Also, you didn't tell them the truth that you owned this laptop that is a ASUS model G7 with a serial number indicated, is that also correct, that you lied

to them about owning that?

THE DEFENDANT: I lied about having access to it, but it wasn't owned by me.

THE COURT: But you were using both of them; is that right?

THE DEFENDANT: That's correct.

THE COURT: And you lied to them and told them that you didn't have access to use them; is that also a false statement?

THE DEFENDANT: Yes, your Honor.

THE COURT: And when you told them that, you knew that wasn't true; is that correct?

THE DEFENDANT: That's correct.

THE COURT: Now again, I don't want to leave you with any confusion. When it talks about that the jurisdiction of the judicial branch of the United States Government, I want to explain that to you. Probation is an arm of the judiciary. So if you lied to a probation officer, then it does impact the judicial branch. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now with respect to Count Two, it says beginning in or about August 2014, the exact date being unknown to the grand jury, and continuing until on or about December 3rd, 2015, that you did knowingly control, manage, supervise, direct, and own all or part of an unlicensed money

transmitting business. Now listen to this: That term is defined in 18 USC Section 1960(b)(1)(b). Let's stop. So is it true and you have gone over the definition contained in Title 18 of the United States Code section 1960(b)(1)(b) with Mr. Leonardo and Mr. Lembke; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: And is it true that somewhere beginning in or before August 2014 and continuing until about December 3rd, 2015, here in the Western District that you did supervise, manage, direct, an unlicensed money transmitting business as it is defined in the federal law; is that true?

THE DEFENDANT: Yes, your Honor.

THE COURT: Is it also true that you failed to comply with the money transmitting business registration requirements that are set forth in federal law; is that also true?

THE DEFENDANT: Yes, your Honor.

THE COURT: And the last part of the count says and which affected interstate or foreign commerce in any degree. Perhaps, Mr. Xiang, you could explain for my benefit and Mr. Petix's benefit if the case had gone to trial how was the Government going to prove that the unlicensed money transmitting business impacted interstate or foreign commerce?

MR. XIANG: In this case as to Count Two, Judge, we are talking about Mr. Petix's involvement in the transfer of

Bitcoins on behalf of various paying customers in the public. And the effect on interstate commerce is at least the two following ways: One is that customers -- he met certain customers within the Western District of New York in person and took cash payment and made Bitcoin transfers on their behalf. Those customers, at least some of them and one of whom would testify at the trial, spent all of his Bitcoins on the dark net. The vast majority to buy quantities -- distribution quantities of high grade marijuana which were shipped to him from suppliers on the west coast. We have two packages that were intercepted through the mail.

THE COURT: So that was across state lines.

MR. XIANG: Right. Effecting interstate commerce. The second matter is that Mr. Petix also had paying customers who were out of New York State. And his bank of America records among other things would show at trial by our count about 80 transactions totaling approximately $100,000 where they were out of state counter deposits of cash. So we have them in Florida. We have them in the Carolinas. And based on text messages and other evidence, we would link them to Bitcoin transfers and transactions he made here. So the out of state deposits of cash into the financial institutions of Bank of America, that too, would have affected interstate commerce.

THE COURT: Do you understand the position?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you dispute anything that Mr. Xiang said?

MR. LEMBKE: Well, we --

12:39:55PM THE COURT: Let me ask you this --

MR. LEMBKE: Give me a second. There are some specifics of the allegations that he made that Mr. Petix disputes, but he does not dispute that at least one, I believe that is correct, that at least one of the transactions which 12:40:16PM qualified as operating a money transmitting business involved a transfer of funds from New York State to another state.

THE COURT: Do you agree with that?

THE DEFENDANT: Yes, your Honor.

THE COURT: In other words, what I'm -- what I 12:40:38PM explained to you last time is this whole thing on interstate commerce means that something crossed over state lines. It crossed either out of New York to another state or into New York from another state.

MR. XIANG: It's a fairly de minimis element here. 12:40:58PM The interstate nexus and the Government's other position would have been the use of this Bitcoin program protocol.

THE COURT: The dark net.

MR. XIANG: In itself, it would have been sufficient. But as to the allocution as to the jury 12:41:14PM instructions, the proposed jury instructions we filed, a

single transaction would not have been enough to make the operation of a business. So that's why the Government recited the scope of that company or the customers that this was more than one single transaction. So as long as -- I wouldn't have brought this up right now, but since they did bring up this issue of his pleading that he acknowledges one transaction out of state --

12:41:31PM

MR. LEMBKE: How about we say --

MR. LEONARDO: Hold on. Let him finish.

12:41:49PM

MR. XIANG: If that was simply for the interstate commerce part, that would be fine but it couldn't be to the operating business.

MR. LEONARDO: I thought we were talking about the interstate commerce part.

12:42:01PM

MR. XIANG: As long as we acknowledge this.

THE COURT: Let me ask you this: In your transmitting business, you engaged in -- give me a rough idea of how many transactions.

MR. LEMBKE: Well, for the purpose of what we believe to be a money transmitting business, more than one.

12:42:14PM

THE COURT: Well, give me an idea of how many. I mean, is it 10? I mean, it's not going to impact anything.

MR. LEMBKE: Well, it's going to impact -- his admissions here could impact on the monetary relative conduct because there are some -- we intend --

12:42:42PM

THE COURT: Okay. Let me ask Mr. Xiang. How many transactions would be required to satisfy a money transmitting business?

MR. XIANG: The law doesn't specify. And at trial, 12:43:00PM we would have put forward over 100 transactions totalling over $200,000 that, to us, would have been sufficient, but there is no hard line.

MR. LEMBKE: We take a different position in terms of what, in fact, is required for a money transmitting 12:43:19PM business. And although the number of transactions may be a factor, we think that the pertinent and key element is the transmission of money received by a business from a customer.

THE COURT: Let me stop you there. Is an interstate nexus based on one transaction?

12:43:54PM MR. XIANG: Yes, we have that.

THE COURT: We have that.

MR. LEMBKE: Yes.

THE COURT: So the Government has to provide me, and if it's an issue we will look at it, does the defendant 12:44:03PM have to admit to how many transactions you are saying that you are comfortable with 100 transactions that would establish a money transmitting business. There are two transactions to establish a money transmitting business because what the defense has admitted is more than one.

12:44:22PM MR. XIANG: Judge, if he will admit to more than

one and the operation of the business, and we can contest this -- I understand where they are coming from. They are contesting that certain transactions that I say fell within they are going to say it doesn't and that could affect the offense level at the end.

MR. LEMBKE: Yes.

MR. XIANG: So if the Court will accept that as to my factual basis, that it's over 100 transactions over $200,000 and they won't go the full way, but they will say we did enough of those to satisfy the element. If the Court is satisfied with it, then I am for the purpose of this --

THE COURT: I don't know if I'm satisfied because I haven't done the research yet. So what I don't want to do is buy -- remember, this can be appealed. I don't want it to be appealed that there is no factual colloquy to support this charge. If the Government is satisfied with the defendant saying I engaged in more than one transaction, is that sufficient or are you going to have to do the appeal, is it going to be no we didn't admit -- we didn't admit -- we did have a sufficient factual colloquy to support a colloquy to plea two.

MR. XIANG: I will put a couple of more things on the record and maybe they will agree to this. Then I think we have it. There were at least 31 transactions that were done locally. So there is no -- there is no questioning or guess

work as to what the transactions were for. 31 totalling about $90,000. And these three witnesses we have, they are on my witness list, all were Bitcoin transactions with Mr. Petix. He advertised his business openly on a website called localbitcoins.com. And that too is an indication of the operation of a business with services -- money transmitting services to the public. You could text him through the number he put on there. And one of the ads is a marked exhibit which they have as well. So he advertised his business. He conducted transactions with people locally. He did transactions with people across state lines remotely. And there was more than one transaction. I think that should be enough.

THE COURT: Do you -- let me ask you, Mr. Petix. Do you agree to what Mr. Xiang just said?

THE DEFENDANT: No.

THE COURT: All right. You know what --

MR. LEMBKE: But wait a minute because I don't want you to throw in the towel here. Okay? And here is why. Because there are certain transactions that, in our view based on our research, may have been Bitcoin transactions, but do not necessarily or do not, in fact, constitute activity of a money transmitting business. Okay?

THE COURT: Let me stop you. Here is what I'm hearing. I'm hearing from the prosecution that unless

Mr. Petix admits to multiple money transmitting events that it may not be a sufficient factual basis for Count Two; is that correct or not correct, Mr. Xiang?

MR. XIANG: That's correct, your Honor.

12:48:06PM THE COURT: If he's not going to admit to them, I understand that, but then I am not going to accept the plea unless you can show me some case law that he is wrong.

MR. LEMBKE: I will do two things. Number one, I will go better than case law. And I will read from the statute. If you look at 18 United States Code Section 1916 --

12:48:19PM

MR. LEONARDO: 1960.

MR. LEMBKE: 1960. There is not a single thing in there that discusses a volume -- minimum volume of transactions. For example, and you just stated another way, if there was one transaction that the Government thought was a transaction of a money transmitting business, they may be able to prosecute someone.

12:48:45PM

THE COURT: That's not what Mr. Xiang is saying.

MR. LEMBKE: All right. But our definition of a money transmitting business is based on the Second Circuit. A Second Circuit case from 1999 called United States versus Velastegui, and it's V-E-L-A-S-T-E-G-U-I, 199 Fed. 3rd.

12:49:10PM

THE COURT: 199 Fed 3rd.

MR. LEMBKE: 590.

12:49:54PM THE COURT: 590.

MR. LEMBKE: Page 592 Second Circuit 1999. If you read the definition and at the part in that case that begins with "a money transmitting business... "

THE COURT: I am just looking at some stuff. So 12:53:25PM Mr. Xiang, I'm getting from this side one transaction is enough. I'm getting from you it's not enough.

MR. LEMBKE: Well, let's back up for a second. My understanding is that Mr. Petix is prepared to admit that he engaged in more than one transaction in which he received 12:53:51PM money from a customer and then for a fee paid by the customer transmitted that money to a recipient in a place that the customer designated. Okay? For the purposes of it being a transmitting business, to wit, Western Union.

THE COURT: Okay.

12:54:10PM MR. LEMBKE: And that his conduct and at least one of those more than one occasions affected interstate commerce because it was transferred.

THE COURT: Understood.

MR. LEMBKE: And I think we are there.

12:54:27PM THE COURT: Is more than one sufficient?

MR. XIANG: Yes, and I think I took mine from Sans which I think Judge Sans --

THE COURT: Mr. Petix, do you admit to what Mr. Lembke said that you engaged in more than one transaction that 12:54:44PM involved a money transmitting business and at least one of

those transactions impacted interstate commerce? Do you agree to that?

THE DEFENDANT: I do agree to that. But what he said about the $90,000 in transactions that were arms length transactions, I don't --

MR. LEMBKE: That is all in dispute.

THE DEFENDANT: All right.

THE COURT: I'm just asking, Mr. Xiang, what Mr. Petix admitted to sufficient from the Government's point of view in their research?

MR. XIANG: Ask the question again. What was the question.

THE COURT: I said what Mr. Petix just admitted he admitted to what you suggested more than one, one of which effected interstate commerce. Is that sufficient?

MR. XIANG: More than one. It was a regular business, yes. That's enough.

THE COURT: Okay. So we are on the same page. That's sufficient. And you agree that you weren't licensed to do this?

THE DEFENDANT: I agree with that.

THE COURT: In any event, the Court now finds based on our extensive discussions here in court and based upon Mr. Petix's acknowledgement of the allegations contained in Count One of the indictment and Count Two of the indictment as

well as conversations with the Court that the factual basis does exist for his pleas to both counts that the Court will accept.

I am now going to ask you, Mr. Petix, in Mr. Lembke's presence and Mr. Leonardo's presence as to Count One pursuant to the indictment which charges the crime of material false statement in violation of Section 18 of the United States Code Section 1001.8, how did you plead guilty or not guilty?

THE DEFENDANT: Guilty, your Honor.

THE COURT: With respect to Count Two charging with the violation titled 18 United States Code Section 1960 operating an unlicensed money transmitting business, how do you now plead in Mr. Lembke's and Mr. Leonardo's presence guilty or not guilty?

THE DEFENDANT: Guilty, your Honor.

THE COURT: Do we have a sentencing date?

THE CLERK: August 7th at 10:15.

MR. LEMBKE: Your Honor, I am out of town that week.

THE COURT: We will figure it out. I take it Mr. Lembke and Mr. Leonardo you want to adjourn the supervised release violation until after sentencing on the plead to the indictment?

MR. LEONARDO: I think his admission here

constitutes an admission.

THE COURT: So --

MR. LEONARDO: Unless you want to sentence him to time served today.

12:57:34PM THE COURT: Okay. So what we will do, Kathy, is put the violation of supervised release on the same date of the sentencing on the indictment. What will work for you Mr. Lembke and Mr. Leonardo?

MR. LEMBKE: What? Say that again.

12:57:51PM THE COURT: What works for you? You said you are out of town --

MR. LEMBKE: Yes, summer vacation is August 6th through the 12th.

THE COURT: So you are back --

12:58:00PM MR. LEONARDO: The week of the 14th?

MR. LEMBKE: Yes.

THE CLERK: I can do the 14th.

THE COURT: Although, hopefully, I'm here and not in Utah for my son.

12:58:15PM THE CLERK: August 14th at 9:15?

MR. LEONARDO: What time on that day?

THE CLERK: 9:15.

THE COURT: If anything changes, I will let you know, but we are here on that day and we will carry on then.

12:58:50PM Thank you, Counsel.

MR. LEMBKE: Your Honor.

MR. LEONARDO: Before we leave here.

MR. LEMBKE: In light of the ability that Mr. Petix has been in custody now for 17 months and in order to be able to allow the Court to consider and render an appropriate sentence that will not be in essence muted out by his time spent detained pending sentencing, we request that the Court release Mr. Petix during sentencing. And I guess to state it another way, if the Court determines, for example, that a sentence of 17 months or 16 months is the appropriate sentence under 3553A, then by August he would have already served that amount of time or even if 18 months, or 19 months, or 20 months. So in that regard, we are requesting that the Court release Mr. Petix. And I believe that there are certain statutory requirements for release pending sentencing 18 3150 --

MR. XIANG: 43A -- 3143(a), Judge.

THE COURT: Mr. Lembke, before you make the application, I want hear from the Government. But you have to take into consideration that one of the conditions of supervised release now is Mr. Petix is in the sex offender treatment. I don't know if he can get back into sex offender treatment. That is one of the requirements. Those conditions are not going to change.

MR. LEMBKE: First of all, he already completed it.

Second of all --

THE COURT: Completed what.

MR. LEMBKE: Sex offender treatment.

MR. LEONARDO: He is no longer in treatment at this point.

THE COURT: Pardon?

MR. LEMBKE: He is no longer in treatment. He has been favorably discharged from treatment.

THE COURT: What program?

01:01:26PM THE DEFENDANT: It was the one in Bath, New York.

THE COURT: Yes. Okay. Gotcha. What's the Government's position?

MR. XIANG: The Government opposes this. Both to this case and to the supervised release case under 3143(a) 01:01:43PM unless he were -- unless the Court were not going to impose any term of incarceration as expected under the guidelines which is not the case based on what's been reported which the court hasn't accepted it yet, but at least it's contemplated. The defense has to show by clear and convincing evidence that 01:02:02PM he is not a danger or a flight risk. Judge, the very things he pled, the use of the smart phone, the internet hacking device, the use of the laptop, the lying to probation about them, these very things show that the supervision -- well, I wouldn't go so far, maybe, as to call it contempt for the 01:02:21PM Court's authority to impose it. But his history shows that he

is certainly not supervisable. I don't know by any standards, certainly not clear and convincing, that both with the pending supervised release violation and the acknowledgement here of the criminal conduct while on supervised release. I mean, these are not accidents to have a laptop, to have a smart phone, to have six flash drives that are still encrypted and we still don't know what's on them. So I think it's premature to suppose that the Court would impose a sentence that is moot.

01:02:48PM

THE COURT: The Court is going to deny the application. Mr. Lembke and Mr. Leonardo, if you can talk to probation and move up the sentencing to July while we are here, I would be happy to do that. The Court is going to deny the application at this point.

01:03:06PM

MR. LEMBKE: Let me be heard here that there is clear and convincing evidence that Mr. Petix is not likely to flee, number one, or pose a danger. Those are the two requirements. Will he in flee, meaning will he flee the jurisdiction and not show up to court for sentencing. And there is no information that the Government can put forward, in fact, during the time that he was on supervised release, despite the fact that he violated the terms of supervised release doesn't have anything to do with whether or not he would flee. In fact, he was right here in the Western District of New York when he was arrested.

01:03:17PM 01:03:38PM 01:03:59PM

Number two, in terms of whether he imposes a danger to the community, I'm at a loss to see how there is any evidence and, in fact, the evidence of Mr. Petix's conduct even before his prior conviction and during the relatively brief time he was on supervised release establishes that he was not then and has never been a danger to the community. His possession of smart phones, computers if that -- if all of that stuff, even if it's in violation of supervised release, adds up to someone being a danger to the community, then we are all in trouble. And I think the Government despite the innuendo and supposition of these thumb drives and things like that, knows that the evidence that is before the Court is that the only purpose for his use of a smart phone and the internet was this non-violent non-dangerous conduct of essentially trading Bitcoin with people on arms length consensual deals. He didn't put up any resistance to any police officers, physical resistance. I mean, really to think he is a danger to the community, I think, is just wrong.

MR. LEONARDO: Judge, I think a hearing -- several hearings were held on that issue, detention hearings. Magistrate Payson held a lengthy hearing the day before Christmas Eve. And I think you had a chance to pass on it based on the allegations then which I think are different now in terms of what the defendant is charged with and what he just plead guilty to.

MR. XIANG: I would just note, Judge, that at least to the supervised release, the burden of reduction and the proof on the defense. And I think the Court has said this before, and I wasn't here. Mr. Resnick would have handled the detention on that issue. But they -- by not producing the pass codes and disclosing what's on the six flash drives, it leaves the Court in no position to be able to assess or at least leaves them unable to meet that burden.

MR. LEMBKE: And I'm renewing my argument now that you not consider it.

THE COURT: I'm not considering that. The Court has extensive issues on that. And if I remember correctly, he denied the flash drives were his.

MR. LEONARDO: Correct.

THE COURT: So to get him to admit the flash drives are his would be denial of the opposite result, if he admitted the flash drives were his and gave him the password. So I am not considering it.

What we are missing is the violation of supervised release. It is now and it says that the judicial officer shall enter into an order of revocation if after hearing the judicial officer finds that there is one probable cause that the person committed another federal, state, or local crime -- well, you have that -- and finds that (b) the person is unlikely to abide by any conditions or combinations of

01:09:30PM

condition of release. Well, he didn't abide by a condition of release as set forth in the petition of the application.

So I don't have to address his release on this charge because I'm addressing his situation on the supervised release. He's shown there is a pretty good indication that he's unlikely to abide by the condition of release because he didn't abide by the condition of release which was not to commit another federal, state, or local crime. The application for release is denied. You can have an exception. We will be back for the sentencing. Thank you.

01:09:48PM

(Whereupon, the proceeding concludes at 1:09 p.m.)

* * *

REPORTER CERTIFICATE

I, Briana L. Jeffords, do hereby certify that I did report in stenotype machine shorthand the proceedings held in the above-entitled matter.

*Briana L. Jeffords*
BRIANA L. JEFFORDS
Freelance Court Reporter and
Notary Public No. 01JE6325111
in and for Genesee County, New York